JEFFREY T. LINDGREN /CA SB# 176400
jlindgren@vbllaw.com
ERIC W. BENISEK /CA SB# 209520
ebenisek@vbllaw.com
VASQUEZ BENISEK & LINDGREN LLP
3685 Mt. Diablo Blvd., Suite 300
Lafayette, CA 94549
Telephone:    (925) 627-4250
Facsimile:    (925) 403-0900

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Richard A. Leines, | No. |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | **BREACH OF CONTRACT,** |
| Homeland Vinyl Products, Inc., | **BREACH OF EXPRESS WARRANTY,** **BREACH OF IMPLIED WARRANTY,** **BREACH OF COVENANT OF GOOD** |
| Defendant. | **FAITH AND FAIR DEALING,** **FALSE ADVERTISING,** **UNFAIR COMPETITION, AND** **PATENT INFRINGEMENT** |
| | DEMAND FOR JURY TRIAL |

Plaintiff Richard A. Leines ("Leines" or "Plaintiff") files this Complaint for Breach of Contract, Breach of Express Warranty, Breach of Implied Warranty, Breach of the Covenant of Good Faith and Fair Dealing, False Advertising, Unfair Competition and Patent Infringement against Defendant Homeland Vinyl Products, Inc. ("Homeland" or "Defendant"), and states and alleges as follows:

## JURISDICTION AND VENUE

1.       This is a civil action related to Homeland's various breaches of a patent license agreement (the "License Agreement") between Leines and Homeland, which by its terms is governed by California law, and was executed and performed, at least in part, in Leines' offices in

1

Contra Costa County, California (a true and correct copy of which is attached hereto as **Exhibit A**). Homeland has transacted substantial business in California, including but not limited to its entering into a contract with Leines to manufacture and sell Licensed Products to Leines in Northern California, and its subsequent provision of such products to Leines in Northern California, including within Sacramento County. The amount in controversy exceeds $75,000, exclusive of interest and costs, and this case is between citizens of different states. Accordingly, this Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1332.

2.     This is also a civil action arising under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*, including without limitation, 35 U.S.C. §§ 271 and 281. This Court has exclusive subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

3.     Venue is proper in the District under 28 U.S.C. §§ 1391 and 1400(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District where Homeland has done business and committed infringing acts and continues to commit infringing acts. Moreover, pursuant to the License Agreement between the parties, all disputes related to the License Agreement are to be brought in either the state court located in Contra Costa County, or the federal courts located in Sacramento, California. (Ex. A, Article 33.)

**PARTIES**

4.     Plaintiff Richard A. Leines is an individual currently residing in Wellington, Nevada, and is the sole listed inventor of U.S. Patent No. 6,594,961 (the "'961 patent").

5.     On information and belief, Defendant Homeland Vinyl Products, Inc. is an Alabama corporation with its principle place of business at 3300 Pinson Valley Parkway, Birmingham, Alabama 35217. On information and belief, Homeland is in the business of manufacturing, marketing, selling and providing residential and commercial vinyl products, including vinyl fence, vinyl deck, vinyl railing, and specialty products. Upon information and belief, several of Homeland's vinyl products are covered and/or practice one or more of the inventions claimed in the '961 patent, including, but not limited to, Homeland's "Gorilla Lock" deck products. On information and belief, a portion of Homeland's revenue derives from the sale

COMPLAINT

of its vinyl products that are covered and/or practice the '961 patent. On information and belief,

Homeland has done and continues to do business in this District.

**U.S. PATENT NO. 6,594,961**

6.      Plaintiff is the owner of all rights, title and interests in the '961 patent, entitled

"DECK PLANK EXTRUSION AND RETAINING CLIP." The '961 patent was duly and legally

issued on July 22, 2003 by the United States Patent and Trademark Office. A true and correct

copy of the '961 patent is attached hereto as **Exhibit B**.

7.      Exemplary claim 11 of the '961 patent provides as follows:

11. A deck board which can be attached to an underlying surface easily in one
downward motion and with a simple clip, comprising: a deck board of rigid
material having a width and a length, the width being substantially less than the
length, said deck board having a pair of opposite edges, said opposite edges
having a separation that defines said width, said deck board having an upper
surface and an under side, said under side of said deck board having a bottom
surface which is substantially parallel to said upper surface and an elongated
recess in a portion of said bottom surface, said elongated recess extending along
the length of said deck board, said elongated recess having a pair of sidewalls
which directly face each other and which are spaced apart by a predetermined
spacing, a bottom portion of each of said pair of sidewalls of said elongated recess
tapering up and inward toward the opposite sidewall to a ledge which faces
upward, so that said sidewalls contain a respective pair of upwardly facing ledges,
each ledge extending from and being spaced up from the bottom of a respective
sidewall by a predetermined distance, said ledges extending into said recess from
said respective sidewalls toward each other, whereby said deck board can be
connected smoothly and securely to a clip having a pair of outwardly facing
flanges while maintaining a uniform alignment of said elongated deck board over
said surface, yet can be readily disconnected, and such that said deck board can
be trimmed in width at said edges of said deck board without disturbing the
attachment of said deck board to said clip.

(Ex. B, col. 11, line 60 – col. 12, line 27.)

**FACTUAL BACKGROUND**

**Richard Leines and His Invention**

8.      While contracting in the 1990's in Northern California. Leines came across

various deck products for outdoor applications. Upon using these different products, Leines

determined there was a need for a better deck product—one which would be easier to install and

3

function well for both the contractor and the homeowner. Leines developed and patented his invention. He searched and located a reputable tool and die manufacture. The patented product was produced, tested, and was soon used and sold by Leines. Subsequently, Leines engaged in talks with Defendant, the leader in PVC fence, deck, and rail products in North America. Soon after, Leines and Homeland agreed to and signed an exclusive license to Leines' '961 patent.

**Leines Grants an Exclusive License of the '961 Patent to Defendant Homeland**

9. On or about June 2012, Randall N. Heath ("Heath"), President of Homeland, and Leines met to negotiate an exclusive license to Leines' '961 patent, and thereby permit Homeland to manufacture, market, use, sell, and provide products that practice one or more of the inventions claimed in the '961 patent. From June until July, the Parties, with the assistance of counsel, negotiated the terms of the proposed license.

10. On July 31, 2012, the Parties reached agreement on the terms of the License Agreement for the '961 patent. (*See* Ex. A.)

11. As of the July 31, 2012 effective date of the License Agreement, and per the terms of the License Agreement, Leines (Licensor) granted an exclusive license to Homeland (Licensee) to make, use, sell, offer to sell, or import "Licensed Products" in the United States, in exchange for valuable consideration in the form of a royalty and various warranties and obligations made by Homeland. (*Id.*)

12. Article 2.2 of the License Agreement defined "Licensed Products" as "any product, apparatus, method or service the manufacture, use, sale of which (a) is covered by a" valid claim of the '961 patent, or "… (c) is sold by [Homeland] and incorporates, uses, or employs" the invention(s) and know-how described in the '961 patent. (*Id.*, Article 33.)

13. Article 16 of the License Agreement included a "best efforts" clause, under which Homeland expressly warranted that it would use "best commercial efforts" in its marketing of Licensed Products, and that any such marketing and sales would be "in conformance with the principles, applicable laws and regulations acceptable in the normal course of good business practices" as follows:

COMPLAINT

**Article 16-Licensee Warranties.** Licensee warrants that it will use its best commercial efforts to market the Licensed Products and that their sale and marketing shall be in conformance with the principles, applicable laws and regulations acceptable in the normal course of good business practices. Licensee shall use its best efforts to bring the Licensed Patent Rights to market through a thorough and diligent program and to continue these efforts throughout the life of this Agreement.

(*Id*., Article 16.)

14.     Article 21 of the License Agreement also required Homeland to "distribute and sell" the Licensed Products in "commercially reasonable quantities" as follows:

**Article 21-Exploitation.** Licensee agrees to manufacture, distribute and sell the Licensed Products in the Territory as defined in Article 6.1 in commercially reasonable quantities during the term of this Agreement and to commence such manufacture, distribution and sale within a period of six (6) months from the effective date of this Agreement. …

(*Id*., Article 21.)

15.     Pursuant to Article 10.2 of the License Agreement, Homeland agreed to manufacture and sell to Leines 480,000 linear feet of Licensed deck per year:

**10.2** In addition to the Royalty, Licensee agrees to manufacture and sell to the Licensor, over the Initial Term of this Agreement, and the Renewal Term, if so renewed, up to Four Hundred and Eighty Thousand linear feet (480,000 l.f.) per year of deck which incorporates the technology of the Licensed Product, at a price agreed upon by both parties.

(*Id*., Article 10.2.)

16.     The License Agreement included a Warranty in Article 23, under which Homeland agreed to provide a warranty on Licensed Products sold pursuant to the following terms:

**Article 23-Warranty**. Licensee shall, throughout the Term, offer and maintain a limited lifetime warranty covering the Licensed Product manufactured, imported and/or acquired by the Licensee. This warranty shall cover material defects and manufacturer workmanship and exclude product damages not inflicted or caused by manufacturer error or material defect, e.g. but not limited to, improper installation, settlement, soil movement. If defect or degradation is discovered in the Licensed Product as a result of material defect or manufacturer workmanship, Licensee will replace the defective product; however, Licensee is not liable or responsible for labor, incidental or consequential or other expenses pertaining to the removal, disposal, replacement, or installation of either the original or replacement products.

5

(*Id*., Article 23.)

17.     The License Agreement included an indemnification clause in Article 17, under which Homeland agreed to indemnify Leines from any damages and liabilities arising from Homeland's breach of its representations and warranties, Homeland's manufacturing defects or failure to perform, and any claims arising from Homeland's advertising, distribution or marketing of the Licensed Products, as follows:

> **Article17-Indemnification by Licensee.** Licensee shall indemnify Licensor and hold Licensor harmless from any damages and liabilities (including reasonable attorneys' fees and costs) (a) arising from any breach of Licensee's warranties and representation as defined in the Licensee Warranties, above; (b) arising out of any alleged manufacturing defects or failures to perform relating to the Licensed Products that are not excluded by Licensee's limited product warranty or any product liability claims or use of the Licensed Products not disclaimed or excluded by Licensee's limited product warranty and disclaimers; (c) any claims arising out of advertising and distribution or marketing of the Licensed Products by Licensee.

(*Id*., Article 17.)

18.     The License Agreement included an insurance clause in Article 24 which required Homeland to maintain insurance in Leines' benefit pursuant to the following terms:

> **Article 24–Insurance.** Licensee shall, throughout the Term, obtain and maintain, at its own expense, standard product liability insurance coverage, naming Licensor as additional named insured. Such policy shall: (a) be maintained with a carrier having a Moody's rating of at least B; and (b) provide protection against any claims, demands and causes of action arising out of any alleged defects or failure to perform of the Licensed Products or any use of the Licensed Products. The amount of coverage shall be a minimum of two million US dollars ($2,000,000.00) with no deductible amount for each single occurrence for bodily injury or property damage. The Policy shall provide for notice to the Agent and Licensor from the insurer by Registered or Certified Mail in the event of any modification or termination of insurance. Licensee shall furnish Licensor and Agent a certificate from its product liability insurance carrier evidencing insurance coverage in favor of Licensor, and in no event shall Licensee distribute the Licensed Products before the receipt by the Licensor of evidence of insurance.

(*Id*., Article 24.)

COMPLAINT

19.     The License Agreement also included a termination clause in Article 26, which

defined a five (5) year term after which the License would terminate unless renewed by

Homeland:

> **Article 26-Termination.** This Agreement shall terminate at the end of Five (5)
> years (the "Initial Term") unless renewed by Licensee under the same terms and
> conditions for the remaining life of said Patent (the "Renewal Terms") provided
> that Licensee provides written notice of its intention to renew this Agreement
> within six (6) months prior to expiration of the current term. In no event shall
> the Agreement extend longer than the date of expiration of the longest-living
> patent (or patents) or last remaining patent application as listed in the definition
> of the Technology.

(*Id.*, Article 26.)

20.     The License Agreement further included a clause in Article 28 regarding the effect

of termination, under which the Parties agreed that no further manufacture, sales, distribution,

sublicensing, imports and/or acquisition of Licensed Products by Homeland would be permitted

under the License Agreement after one hundred and twenty (120) days from the date of

termination:

> **Article 28-Effect Termination.** After termination of this license, all rights
> granted to Licensee under this Agreement shall terminate and revert to
> Licensor, and Licensee will refrain from further manufacturing, copying,
> marketing, distribution or use of any Licensed Product or other product which
> incorporates the Technology that is not in Licensee's customer order backlog,
> inventory or work-in-process ("Terminating Inventory/Order Pool") on that
> date ("Termination Date"). Within thirty (30) days after termination, Licensee
> shall deliver to Licensor a statement indicating the number and description of
> the Licensed Products which it had on hand or was in the process of
> manufacturing as of the Termination Date. Licensee may continue
> manufacturing the Licensed Products to satisfy the customer backlog
> obligations on the Termination Date. Licensee, may, in an orderly fashion, sell
> the Licensed Products covered by this Agreement that were in its inventory and
> work-in-process on the Termination Date. At the end of the post-termination
> sale period, Licensee shall furnish a royalty payment and statement as required
> under the Payment Article. Upon termination, Licensee shall deliver to Licensor
> all Licensor-owned tooling and molds used in the manufacturing of the
> Licensed Products. Licensor shall bear the costs of shipping for that tooling and
> molds. In no event shall further manufacturing, sale, distribution, sublicensed,
> import and/or acquired License Product be permitted under this Agreement
> beyond one hundred and twenty (120) days from Termination Date.

(*Id.*, Article 28.)

7

21.     The License Agreement included an attorneys' fees clause in Article 30, which provided the prevailing party the right to collect its fees and costs incurred in enforcing or defending the License:

> **Article 30-Attorney's Fees and Expenses.** In any litigation action taken to enforce the terms of this Agreement, the prevailing party shall have the right to collect from the other party its reasonable costs and necessary disbursements and attorney's fees incurred in enforcing or defending this Agreement.

(*Id*., Article 30.)

22.     The License Agreement included a governing law clause in Article 32, which provided that the "License Agreement shall be governed in accordance with the laws of the State of California." (*Id*., Article 32.)

23.     The License Agreement included a jurisdiction clause in Article 33, which provided:

> **Article 33-Jurisdiction.** The parties consent to the exclusive jurisdiction and venue of the federal courts located in Sacramento, California or State courts located in Contra Costa County, California in any action arising out of or relating to this Agreement. The parties waive any other venue to which either party might be entitled by domicile or otherwise.

(*Id*., Article 33.)

**Homeland's Manufacturing Defects and Breach of the License**

24.     It took Homeland many months of working on the manufacturing process for the Licensed Products before it was ready to go to market with a purportedly acceptable product. The Licensed Products delivered to Leines in Northern California turned out to be defective on many levels. As discussed below, the Licensed Products manufactured and sold by Homeland was defective on its face, failed to meet basic industry standards and regulations, and failed to comply with Homeland's own internal specification. Not long after Homeland began the manufacture and sale of the Licensed Gorilla Lock product it began failing in the field. Leines currently spends much of his time responding to end-customers' complaints in Northern California about defective Gorilla Lock decking, and cannot in good conscience continue to sell Gorilla Lock manufactured

COMPLAINT

by Homeland because, as discussed herein, it is most likely defective and will eventually require removal and replacement.

25.     Although Plaintiff performed his obligations under the Parties' License Agreement, granting to Homeland the exclusive license to the innovative technology disclosed in the '961 patent, Homeland subsequently breached the License Agreement, based upon information and belief,  by: (1) failing to exert "best efforts" in marketing and selling Licensed Products (Ex. A, Article 16); (2) failing to conform Homeland's Licensed Products with "principles, applicable laws and regulations acceptable in the normal course of good business practices" (*id.*); (3) failing to "distribute and sell" the Licensed Products in "commercially reasonable quantities" (*id.*, Article 21); (4) failing "to manufacture and sell" 480,000 linear feet of Licensed Gorilla Deck products to Plaintiff each year of the License (*id.*, Article 10.2); (5) failing to acquire and maintain the insurance specified under the License Agreement (*id.*, Article 24), and (6) by failing to pay all royalties due Plaintiff under the License Agreement, including royalties for sales made directly to Plaintiff pursuant to Article 10.2 of the License (*see id.*, Articles 8-10).

**Homeland's Breach of the "Best Efforts" Clause**

26.     As evidenced by Homeland's paltry nationwide sales figures under the License Agreement, Homeland failed to exert "best efforts" to market and sell the Licensed Products. (*See id.*, Article 16.)  Despite its nationwide exclusive license to market and sell Licensed Gorilla Lock deck products, Homeland sold only approximately 228,000 linear feet of Gorilla Lock decking during the five-year life of the License. To put Homeland's sales and marketing efforts in the proper perspective, over the same five-year span, Leines' one-man sales operation, through his business Paragon Systems & Technology, Inc., exceeded sales of 365,392 linear feet of Gorilla lock decking in Northern California alone, thereby exceeding the national sales of the largest vinyl decking company in North America—Homeland—by over 160 percent.

27.     On information and belief, Homeland failed to use "best efforts" to market, sell or sublicense the Licensed Products because it favored the sale of its own "Gorilla Deck" vinyl decking product over the licensed product, "Gorilla Lock." On information and belief, Homeland's favoritism of its own Gorilla Deck over the licensed Gorilla Lock led Homeland to

COMPLAINT

1   under market, sell and sublicense Gorilla Lock in favor of Gorilla Deck. This is borne out by the

2   fact that Leines was able to sell more Gorilla Lock decking in a limited region of Northern

3   California than Homeland was able to sell or sublicense throughout the entire country over a five-

4   year period.

5          28.     Schedule C of the License sheds additional light on the Parties' understanding of

6   the "best efforts" required under Article 16 by assigning different royalty rates for Homeland's

7   sales once they exceed one million linear feet per year. (Ex. A, Schedule C.) On information and

8   belief, it was the parties' reasonable expectations at the time that Homeland would sell over one

9   million linear feet of the Gorilla Lock decking each year.

10  **Homeland's Breach of the "Laws and Regulations" Clause**

11         29.     Article 16 of the License Agreement also required Homeland to conform its

12  Licensed Gorilla Lock deck products with "principles, applicable laws and regulations acceptable

13  in the normal course of good business practices." (*Id.*, Article 16.) There are several industry

14  standards that Gorilla Lock decking fails to meet notwithstanding representations to the contrary.

15  These standards include (i) the International Building Code ("IBC"), International Residential

16  Code ("IRC"), AC174, the Impact Test, Uplift Force Test and accelerated weather testing. As

17  described below, Homeland's manufacture, sales and marketing of the Licensed Products failed

18  to conform to all relevant principles, applicable laws and regulations:

19                 a.      **Color Fading.** As shown in **Exhibits C-E**, which are attached hereto as

20  true and correct copies of photographs taken in October 2016 and August 2017[1], Homeland's

21  Gorilla Lock green teak, adobe and earl grey decking have all experienced color fading. This

22  fading has occurred in normal California weather conditions in less than 18 months. Such rapid

23  color fading is inconsistent with principles acceptable in the normal course of good business

24  practices and contrary to Homeland's own marketing statements which tout the longevity of the

25

26

---

27  [1] The photograph in Exhibit C was taken on October 4, 2016; the photographs in Exhibits D and E
    were taken on August 17, 2017.

28

COMPLAINT

color and look of Homeland's vinyl decking.  *See infra*, ¶ 33 (describing Homeland's color protection).

b.      **Delamination.** As shown in **Exhibits F-H**, which are attached hereto as true and correct copies of photographs taken between November and December 2017[2], Homeland delivered an entire truckload of honey maple decking where the cap stock was delaminating from the substrate of the vinyl decking. The defective honey maple boards had been sent by Homeland to replace already defective Homeland decking in the field. Vinyl decking that is meant to replace existing defective decking, but is already visibly delaminating, is completely unacceptable from a consumer prospective and plainly violates acceptable principles in the normal course of good business practices.

c.      **Internal Structural Issues.** As shown in **Exhibits I-T**, which are attached hereto as true and correct copies of photographs taken on or about February 7, 2018, Homeland delivered Gorilla Lock decking to Northern California that included a host of hazardous internal structural issues, that failed to meet basic industry regulations and that failed to meet even Homeland's own deck specifications. The specification provided by Homeland and initialed by Homeland's CEO Randall K. Heath (a true and correct copy of which is attached hereto as **Exhibit U**) shows, among other things: (i) internal webs (a.k.a., "walls") designed for 0.080 inches in thickness; (ii) internal webs that are supposed to be linear; and (iii) ledges for mating that are supposed to be 0.090 inches in width and 90 degrees or parallel to the top and bottom deck surface. In contrast to Homeland's internal specification, the Gorilla Lock decking actually produced by Homeland contained: (a) internal walls nowhere close to 0.080 inches in thickness, (b) walls that were bowed or crooked instead of straight, and (c) ledges too narrow to adequately mate the Gorilla Lock decking with the Gorilla Lock tracks. The result is vinyl decking that does not stand-up to industry standard (1) impact testing or (2) uplift force. *See e.g.,* AC 174 Acceptance Criteria for Deck Board Span Rating and Guardrail Systems, 2012; 2015

---

[2] The photographs in Exhibits F and G were taken on November 3, 2017. The photograph in Exhibit H was taken on December 30, 2017 and shows Plaintiff's returning to Homeland both the fading, thin capstock Green Teak decking shown in Exhibits C-E and the delaminated Honey Maple decking in Exhibits F-G.

COMPLAINT

International Building Code Structural Design/Section 1609 Wind Loads; AAMA 2200-01 "Voluntary Specification for Performance Exterior Walking Surface Plank System."

d.      **Insufficient Cap Stock.** As shown in **Exhibits V and W**, which are attached hereto as true and correct copies of a photograph taken between July and October 2017[3], Homeland manufactured Licensed Products delivered to Northern California without proper cap stock. Exhibit V represents the cap stock delivered to Northern California under the license agreement with a cap stock that is too thin, where Exhibit W represents a Homeland sample with proper cap stock thickness. Homeland's own employees admit that the cap stock for the vinyl decking shown in Exhibit V is far too thin and is problematic. Cap stock that is too thin leads to color fading issues as well as unsafe weakening (brittleness) of the decking itself due to exposure to the elements.

**Homeland's Breach of the Insurance Obligation (Article 24)**

30.      Pursuant to Article 24 of the License Agreement, Homeland had a very specific insurance obligation which was an important aspect of the benefit of the bargain between Leines and Homeland and was meant to protect Leines in the event Homeland produced defective products. This insurance obligation included: (1) coverage that protected against claims arising out of "alleged defects", (2) minimum coverage amounts of $2 million, and (3) naming Leines as an additional insured. On information and belief, Homeland failed to obtain insurance that satisfied any of these contractual requirements.

**Homeland's Breach of its Obligation to Exploit the Licensed Product (Article 21)**

31.      Article 21 of the License Agreement required Homeland to "manufacture, distribute and sell the Licensed Products . . . in commercially reasonable quantities during the term of this Agreement." The parties anticipated selling well over one million linear feet per year per the License Agreement.  However, Homeland failed to sell 250,000 linear feet of Licensed Products nationwide during the entire five-year term of the Agreement, while Leines himself sold

---

[3] The photograph in Exhibit V was taken on July 10, 2017; the photograph in Exhibit W was taken on October 24, 2017.

365,392 linear feet of the Licensed Products in Northern California alone. Homeland plainly failed to sell the Licensed Products in commercially reasonable quantities when compared to the sales of one man in a small region of the country.

**Homeland's Breach of its Manufacturing Obligation for Leines (Article 10.2)**

32.     Pursuant to Article 10.2 of the License Agreement, Homeland was supposed to manufacture and sell 480,000 linear feet of Gorilla Lock every year to Leines. This never happened because Homeland's constant manufacturing and quality control issues prevented Leines from ever being able to acquire sufficient and salable quantities. These manufacturing and quality control issues included (i) delivering Licensed Products where the embossments were too shallow and uneven, requiring a change to the embossment; (ii) honey maple decking that went bad and had color matching issues that prevented selling the product at scale, (iii) late product development and when Licensed Products did come on line it had color issues and embossment problems. These are just some of the issues caused by Homeland that frustrated and prevented Leines from being able to purchase 480,000 linear feet per year of Licensed Products.

**Homeland's False Advertising**

33.     Homeland's marketing materials regarding the Licensed Products are knowingly untrue. Upon information and belief, Homeland's false representations include the following statements:

- "Homeland's products are . . . manufactured . . . to the highest quality standards"
- "The durability of our products are tested to ensure they will stand the test of time, with thicker walls, and a balanced formulation to ensure impact resistance that includes AccuShield added to our protective outer layer."
- "HVP, Inc. manufactures the highest quality vinyl components."
- "HVP, Inc. is committed to the highest standards of quality in its Fence, Deck and Rail business."
- "Homeland's products are proudly manufactured in the USA to the highest quality standards."
- "HVP, Inc. manufactures the highest quality vinyl components."

COMPLAINT

- "ACCU-Shield is our protective outer layer engineered to significantly reduce . . . the damaging effects of the sun's ultraviolet rays. Even in harsh climates, ACU-Shield protects the color and sheen of our products for a longer period of time. Simply put, there is no better protection under the sun than ACCU-Shield."
- "Homeland profiles are specially engineered to retain their freshly painted appearance and can keep yards looking their best – even when the weather is at its worst."
- "Homeland manufactures the toughest PVC profiles the with most advanced UV protection under the sun, our ACCU-Shield formulation."
- "Homeland offers a vast pallet of pleasing colors . . . keeping a freshly painted appearance for years."

34.     Each of the foregoing statements is false and misleading. Homeland's statements that the Licensed Products maintain their "freshly painted appearance for years" and are engineered to "retain their freshly painted appearance" are demonstrably false based on the repeated color fading of the Licensed Products in just eighteen months.

35.     Similarly, Homeland's claim that there is "no better protection under the sun than ACCU-Shield" has been proven false by the repeated failure of Homeland's Licensed Products in less than two-years in the field.

36.     Homeland's statements that it manufactures the highest quality vinyl products is also false. First, Homeland does not even follow its own specifications with respect to the Licensed Products, and produces vinyl decking boards with internal walls (i) that are far too thin and (ii) non-linear to be considered "the highest quality." Second, a large percentage of Homeland's Licensed Products have failed in the field for various reasons suggesting that all the Licensed Products manufactured and sold by Homeland are defective and Homeland is aware of this. Indeed, Homeland sent an entire semi-truck full of Licensed Products to replace defective product in field only to discover the entire truck-load of Licensed Products was defective on its face and had to be returned causing further end-customer delays and anger.

COMPLAINT

**Termination of the Patent License**

37.     On July 31, 2017, the License Agreement terminated following the completion of the initial five (5) year term and Homeland's decision not to renew under the terms of Article 26 (Termination).

38.     Pursuant to Article 28 (Effect of Termination) of the License Agreement, Homeland was no longer permitted to manufacture, use, sell, distribute, sublicense, import and/or acquire Licensed Products under the License Agreement beyond one hundred and twenty (120) days from the July 31, 2017 termination date, which is November 30, 2017.

39.     On information and belief, Homeland has and continues to manufacture, use, sell, distribute, sublicense, import and/or acquire Licensed Products after November 30, 2017, and thereby has and continues to infringe the '961 patent. For example, Leines is aware of the delivery of Licensed Products to a San Mateo, California customer in January 2018, well after the November 30, 2017 cut-off.

40.     On information and belief, Homeland has had knowledge of the '961 patent at least as early as the effective date of the License—July 31, 2012.

## CAUSES OF ACTION

### COUNT ONE – BREACH OF CONTRACT

41.     Plaintiff re-alleges and incorporates the above allegations by reference as if set forth fully herein.

42.     On July 31, 2012, Plaintiff and Homeland entered into a patent License Agreement, whereby Plaintiff granted Homeland an exclusive license to the '961 patent and Homeland warranted to use "best efforts" to market, sell, and manufacture Licensed Products practicing and covered by the '961 patent perform services, including manufacturing and selling Licensed Products to Plaintiff, and that Homeland's marketing, sales and manufacture of Licensed Products would "conform with the principles, applicable laws and regulations acceptable in the normal course of good business practices."

43.     Plaintiff has performed all conditions and obligations to be performed on his part under the License Agreement.

COMPLAINT

44.     On information and belief, Homeland breached the License Agreement by: (1) failing to exert "best efforts" in marketing and selling Licensed Products; (2) failing to conform Homeland's Licensed Products with "principles, applicable laws and regulations acceptable in the normal course of good business practices"; (3) failing to "distribute and sell" the Licensed Products in "commercially reasonable quantities"; (4) failing "to manufacture and sell" 480,000 linear feet of Licensed Gorilla Deck products to Plaintiff each year of the life of the License Agreement; (5) failing to acquire and maintain the insurance specified under the License Agreement; and (6) by failing to pay all royalties due Plaintiff under the License Agreement.

45.     Each of the breaches alleged herein constituted separate and independent material breaches of the License Agreement.

46.     As a direct and proximate cause of these breaches, Plaintiff has and will continue to suffer damages and harm to his business in an amount to be proven at trial.

## COUNT TWO – BREACH OF EXPRESS WARRANTY

47.     Plaintiff re-alleges and incorporates the above allegations by reference as if set forth fully herein.

48.     As alleged above, the parties entered into the License Agreement with Homeland's knowledge that Plaintiff was granting an exclusive license to practice the '961 patent, and thereby manufacture, market and sell Licensed Products that would result in royalties due to Plaintiff under the License.

49.     Homeland expressly warranted that it would use "best commercial efforts" in its marketing of Licensed Products, and that any such marketing and sales would be "in conformance with the principles, applicable laws and regulations acceptable in the normal course of good business practices."

50.     Plaintiff relied upon the express warranty given by Homeland in entering into the License Agreement with Homeland.

51.     As alleged above, Homeland breached the express warranty by failing to use best commercial efforts in its marketing of the Licensed Products, and by failing to conform its marketing and sales of Licensed Products with the principles, applicable laws and regulations

COMPLAINT

acceptable in the normal course of good business practices, causing damage to Plaintiff as a result thereof.

52.     Notice of Homeland's breaches of warranties have been previously provided to it by Plaintiff, but Homeland has refused and/or otherwise been unable to remedy said breaches.

53.     As a result of Homeland's breaches of warranty, Plaintiff has suffered and incurred substantial damages in specific amounts to be proven at trial.

## COUNT THREE – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

54.     Plaintiff re-alleges and incorporates the above allegations by reference as if set forth fully herein.

55.     As alleged above, the parties entered into the License Agreement with Homeland's knowledge that Plaintiff was granting an exclusive license to practice the '961 patent, which required Homeland to manufacture and sell a fixed amount (480,000 linear feet) of Licensed Products to Plaintiff on a yearly basis under the License Agreement.

56.     Homeland was and is a merchant with respect to the goods that are the subject of the License Agreement (Licensed Products), and there was in the sale to Plaintiff of those goods an implied warranty that those goods were merchantable.

57.     Homeland impliedly warranted that the goods provided by Homeland would be of merchantable quality and reasonably fit their intended and reasonably foreseeable purposes.

58.     Plaintiff relied upon the implied warranty given by Homeland as a merchant in entering into the License Agreement with Homeland.

59.     Homeland breached the warranties implied in the License Agreement by failing to manufacture, sell and deliver Licensed Products to Plaintiff that would be of merchantable quality and reasonably fit their intended and reasonably foreseeable purposes. As a result thereof, Plaintiff did not receive the contractually agreed amount of Licensed Products that Homeland impliedly warranted to be merchantable.

COMPLAINT

60.     The above-referenced warranties provided by Homeland have been breached as the Licensed Products were not manufactured by Homeland as intended, thereby causing damage to Plaintiff as a result.

61.     Notice of Homeland's breaches of warranties have been previously provided to it by Plaintiff, but it has refused and/or otherwise been unable to remedy said breaches.

62.     As a result of Homeland's breaches of warranty, Plaintiff has suffered and incurred substantial damages in specific amounts to be proven at trial.

## COUNT FOUR – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

63.     Plaintiff re-alleges and incorporates the above allegations by reference as if set forth fully herein.

64.     In every contract, including contracts governed by the laws of the State of California such as the parties' License Agreement, there is an implied covenant of good faith and fair dealing that requires the parties to deal with one another fairly and in good faith, and to take no action in breach of such covenant.

65.     Plaintiff has performed all his obligations under the License Agreement, and Homeland's obligation to perform and to comply with its covenant of good faith and fair dealing has not been excused.

66.     Homeland has breached the covenant of good faith and fair dealing in the License Agreement by taking the actions alleged above, to wit, by failing to exert "best efforts" in marketing and selling Licensed Products; by failing to conform Homeland's Licensed Products with "principles, applicable laws and regulations acceptable in the normal course of good business practices"; by failing to "distribute and sell" the Licensed Products in "commercially reasonable quantities"; by failing "to manufacture and sell" 480,000 linear feet of Licensed Gorilla Deck products to Plaintiff each year of the life of the License Agreement, and by failing to acquire and maintain the insurance specified under the License Agreement. Such actions by

18                                                                                   COMPLAINT

1  Homeland has injured and reduced Homeland's sales of Licensed Products, thereby depriving

2  Plaintiff of royalties due to him and causing Plaintiff monetary damages.

3      67.    Homeland's breach of the covenant of good faith and fair dealing in the License

4  Agreement by taking the actions alleged above has also deprived Plaintiff of the contractually

5  agreed amount of Licensed Gorilla Deck products to be manufactured and sold to Plaintiff by

6  Homeland, thereby depriving Plaintiff of actual and anticipated sales and causing Plaintiff

7  monetary damages in specific amounts to be proven at trial.

8  **COUNT FIVE – FALSE ADVERTISING (CALIFORNIA B&P § 17500)**

9      68.    Plaintiff re-alleges and incorporates the above allegations by reference as if set

10  forth fully herein.

11      69.    California Business & Professions Code §§ 17500, *et seq*. prohibits false

12  advertising, including any unfair, deceptive, untrue, or misleading statements.

13      70.    Homeland has used, made, approved, and sponsored false and misleading

14  representations of fact in written commercial advertisements, including but not limited to

15  Homeland's marketing and advertisements discussed above, that misrepresent the quality and

16  characteristics of the Licensed Products manufactured, marketed and sold by Homeland.

17  Homeland knew, or in the exercise of reasonable care should have known, that these statements

18  were false and/or misleading.

19      71.    Homeland's false and/or misleading statements were made in connection their sale

20  of Licensed Products under the parties' License Agreement.

21      72.    Plaintiff has been injured by Homeland's acts and has caused Plaintiff monetary

22  damages in specific amounts to be proven at trial.

23  **COUNT SIX – UNFAIR COMPETITION (CALIFORNIA B&P § 17200)**

24      73.    Plaintiff re-alleges and incorporates the above allegations by reference as if set

25  forth fully herein.

26      74.    Homeland's unauthorized manufacture and sale of Gorilla Deck products after the

27  termination of the License Agreement, its unauthorized use of the '961 patent, and its systematic

28  breach of the License Agreement is unfair and offends public policy as it is unlawful, unfair,

COMPLAINT

deceptive, unscrupulous, and constitutes a violation of California's Business and Professions Code Section 17200 *et seq.*

75.     Plaintiff has been damaged by Homeland's unlawful, unfair, deceptive, and unscrupulous business acts herein and Plaintiff will continue to be damaged by the same unless enjoined by this Court.

76.     Plaintiff is entitled to injunctive relief prohibiting Homeland from continuing such acts of unfair competition and appropriate restitution remedies under California's Business and Professions Code Section 17203.

<u>**COUNT SEVEN – INFRINGEMENT OF U.S. PATENT NO. 6,594,961**</u>

77.     Plaintiff re-alleges and incorporates the above allegations by reference as if set forth fully herein.

78.     On July 31, 2017, the License Agreement between Plaintiff and Homeland terminated by its terms.

79.     According to the terms of the License Agreement, Homeland was no longer permitted to manufacture, use, sell, distribute, sublicense, import and/or acquire Licensed Products under the License Agreement beyond one hundred and twenty (120) days from the July 31, 2017 termination date, which computes to November 30, 2017.

80.     On information and belief, Homeland has and continues to manufacture, use, sell, distribute, sublicense, import and/or acquire Licensed Products after November 30, 2017, including Homeland's Gorilla Lock deck products.

81.     On information and belief, Homeland has been and is directly infringing, either by literal infringement or under the doctrine of equivalents, the '961 patent in this judicial district and elsewhere in the United States by making, using, offering to sell, and selling Gorilla Lock deck products that infringe one or more of the claims of the '961 patent. Homeland is thus liable for infringement of the '961 patent pursuant to 35 U.S.C. § 271(a).

82.     Individual end-users of Homeland's Gorilla Lock deck products ("Infringing Users") directly infringe, either by literal infringement or under the doctrine of equivalents, the '961 patent in this judicial district and elsewhere in the United States by using Gorilla Lock deck

COMPLAINT

products which incorporate methodologies that infringe one or more claims of the '961 patent. On information and belief, Infringing Users cannot use the Gorilla Lock deck products without infringing the '961 patent. Homeland has known of the '961 patent since at least the effective date of the License Agreement—July 31, 2012. Homeland's inducement and contributory infringement of the '961 patent includes, but is not limited to, actively encouraging and instructing Infringing Users to use Gorilla Lock deck products in ways that infringe the '961 patent. Given that Infringing Users cannot use the Gorilla Lock deck products without infringing the '961 patent, Homeland has known that Infringing Users' use of these products directly infringes the '961 patent. As a result of Homeland's knowledge of the '961 patent, and knowledge that use by the Infringing Users constitutes direct infringement of the '961 patent, Homeland has knowingly induced Infringing Users to infringe the '961 patent, and knowingly contributed to the infringement by Infringing Users of the '961 patent, in this judicial district and elsewhere in the United States. The Gorilla Lock deck products are not staple articles or commodities of commerce suitable for substantial non-infringing use. Homeland is thus liable for inducing and contributing to the infringement of the '961 patent pursuant to 35 U.S.C. §§ 271(b) and (c) from at least August 1, 2017 and after.

83.     For example, Homeland's Gorilla Lock deck products infringe at least claim 11 of the '961 patent (Ex. A), which includes the following claim elements:

a.      a deck board of rigid material having a width and a length, the width being substantially less than the length,

b.      said deck board having a pair of opposite edges, said opposite edges having a separation that defines said width,

c.      said deck board having an upper surface and an under side,

d.      said under side of said deck board having a bottom surface which is substantially parallel to said upper surface and an elongated recess in a portion of said bottom surface, said elongated recess extending along the length of said deck board,

21

e.      said elongated recess having a pair of sidewalls which directly face each other and which are spaced apart by a predetermined spacing,

f.      a bottom portion of each of said pair of sidewalls of said elongated recess tapering up and inward toward the opposite sidewall to a ledge which faces upward, so that said sidewalls contain a respective pair of upwardly facing ledges,

g.      each ledge extending from and being spaced up from the bottom of a respective sidewall by a predetermined distance, said ledges extending into said recess from said respective sidewalls toward each other,

h.      whereby said deck board can be connected smoothly and securely to a clip having a pair of outwardly facing flanges while maintaining a uniform alignment of said elongated deck board over said surface, yet can be readily disconnected, and such that said deck board can be trimmed in width at said edges of said deck board without disturbing the attachment of said deck board to said clip.

84.      Upon information and belief, Homeland's Gorilla Lock deck products include each of the elements of claim 11 recited above, and such infringement is further shown by the following side-by-side comparison of Figure 2 of the '961 patent (Ex. B) and Homeland's Gorilla Lock deck specification (Ex. U):




*Figure 1: Side-by-side comparison of '961 patent, Figure 2 (Ex. B) and Homeland's Gorilla Lock Specification (Ex. U)*

85.      On information and belief, Homeland's acts of infringement have been and continue to be willful. Homeland is infringing the '961 patent in willful disregard of the Plaintiff's rights making this an exceptional case pursuant to 35 U.S.C. § 285. Homeland has known of the '961 patent since at least July 31, 2012, and further, Homeland has been aware

COMPLAINT

1   since that time that continued sales of Licensed Products beyond the one hundred twenty (120)

2   day deadline after the termination date of the License Agreement constitutes infringement of the

3   '961 patent. Despite this knowledge, and despite an objective likelihood and contractual

4   acknowledgement that its actions constituted infringement, Homeland has continued to infringe

5   the '961 patent. This objective risk of infringement is so obvious that Homeland either knew, or

6   should have known, of it. Homeland has disregarded this obvious objective risk that its actions

7   constitute infringement and indirect infringement of the '961 patent.

8   **<u>PRAYER FOR RELIEF</u>**

9   WHEREFORE, Plaintiff prays for judgment against Homeland as follows:

10       a.   For lost profits, expectation damages, reasonable royalty, compensatory and

11           consequential damages according to proof;

12       b.   For attorneys' fees as provided in the License Agreement between Plaintiff and

13           Homeland;

14       c.   For an order requiring Homeland to destroy any labels, signs, prints, packages,

15           wrappers, receptacles, and advertisements containing any false or misleading

16           statement;

17       d.   For an order requiring Homeland to publish and circulate corrective advertising;

18       e.   For restitution to Plaintiff as a result of Homeland's unfair competition pursuant to

19           California Business Code and Professions Code Section 17200;

20       f.   For a ruling that Homeland has directly infringed and induced others and

21           contributed to others to infringement of the '961 patent;

22       g.   For an order requiring Homeland to pay Plaintiff's damages resulting from the

23           infringement of the '961 patent, along with costs, expenses, pre-judgment and

24           post-judgment interest;

25       h.   For a ruling that the Homeland's infringement of the '961 patent is willful and a

26           trebling of damages pursuant to 35 U.S.C. §284;

27       i.   For a ruling that this action is an exceptional case, and awarding Plaintiff his

28           attorneys' fees and costs pursuant to 35 U.S.C. §285;

COMPLAINT

j.    For preliminary and permanent injunctions enjoining and restraining Homeland and its agents, employees, officers, attorneys, successors, assigns, affiliates and any persons in privity or active concert or participation with Homeland from committing any further acts of infringement;

k.    For an order for a post-trial compulsory license for ongoing infringement, after entry of judgment for infringement;

l.    For an accounting;

m.    For restitution and recovery of unjust enrichment

n.    For pre-judgment and post-judgment interest as ordered by the Court;

o.    For costs of suit herein incurred; and

p.    For any and all additional relief which the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury on all issues so triable.

Dated:  April 19, 2018                  Respectfully submitted,

By: */s/ Eric W. Benisek*
        Eric W. Benisek

Jeffrey T. Lindgren
(CA State Bar No. 176400)
jlindgren@vbllaw.com
Eric W. Benisek
(CA State Bar No. 209520)
ebenisek@vbllaw.com

VASQUEZ BENISEK & LINDGREN LLP
3685 Mt. Diablo Blvd., Ste. 300
Lafayette, CA 94549
Telephone:    (925) 627-4250
Facsimile:    (925) 403-0900

*Counsel for Plaintiff*

COMPLAINT