1

2

3

4

5

6

7

8               UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    RICHARD A. LEINES,                    No.  2:18-cv-00969-KJM-DB

12              Plaintiff/Counter-Defendant,

13       v.                                 ORDER

14    HOMELAND VINYL PRODUCTS, INC.,

15              Defendant/Counterclaimant.

16

17            In this dispute over patented decking materials, plaintiff/counter-defendant

18    Richard Leines ("plaintiff" or "Leines") moves for summary judgment on his breach of contract

19    and patent infringement claims.  Defendant/counterclaimant Homeland Vinyl Products, Inc.

20    ("defendant" or "Homeland") moves for partial summary judgment seeking dismissal of several

21    claims and theories alleged in plaintiff's first amended complaint.[1]  Defendant also moves to

22    exclude the testimony of three of plaintiff's expert witnesses.  For the reasons set forth below, the

23    motions, respectively, are GRANTED in part, DENIED in part and DENIED as moot.

24    _____

25            [1] The court acknowledges that defendant has filed a motion to amend its
26    counterclaims, which remains pending.  As Homeland confirmed at hearing on the motions
      resolved by this order, resolution of the motion to amend has no bearing on resolution of these
27    motions.

28

                                  1

1    I.        BACKGROUND

2              A.    Factual Background

3                    The following disputed facts and undisputed facts are derived from the first

4    amended complaint ("FAC"), ECF No. 27, defendant's response to plaintiff's omnibus statement

5    of facts, Def.'s Disputed Facts ("DDF") & Def.'s Undisputed Facts ("DUF"), ECF No. 89, and

6    plaintiff's response to defendant's statement of facts, Pl.'s Disputed Facts ("PDF") and Pl.'s

7    Undisputed Facts ("PUF"), ECF No. 104.

8                    Plaintiff Richard Leines is the creator of an easy-install vinyl decking product

9    designed for homeowners and contractors alike.  FAC ¶ 8.  On July 22, 2003, Leines obtained a

10   patent on his decking product through the United States Patent and Trademark Office (PTO), as

11   evidenced by U.S. Patent No. 6,594,961 (the "'961 Patent").  Id. ¶ 6; DDF 1 (disputing validity of

12   '961 Patent as indefinite, anticipated and obvious).  On July 31, 2012, Leines entered into an

13   exclusive license agreement ("License Agreement") with defendant Homeland Vinyl Products,

14   Inc. ("Homeland") in which Leines granted Homeland an exclusive license "to make, use, sell,

15   offer to sell, or import 'Licensed Products' . . . in exchange for . . . royalty and various warranties

16   and obligations made by Homeland."  DUF 2, 3.  The License Agreement provides, in pertinent

17   part, as follows:

18                          **[Article 2] Licensed Products 2.2** "Licensed Products" are defined
                            as any product, apparatus, method or service the manufacture, use,
19                          sale of which (a) is covered by a Valid Claim of an issued, unexpired
                            Licensed Patent, or (b) is covered by a claim being prosecuted in any
20                          pending application listed in Schedule B; and (c) is sold by Licensee
                            and incorporates, uses, or employs the Technology.
21
                            . . .
22
                            **Article 8-Royalties** All royalties ("Licensed Product Royalties" or
23                          "Royalties") provided for under this Agreement shall accrue when
                            the respective Licensed Products are sold, billed, and paid for.
24                          Licensee shall be exempt from paying royalties to Licensor on items
                            not billed, including, but not limited to, those samples of the
25                          Licensed Products used for marketing purposes and Licensed
                            Products used for replacing defective Licensed Products as covered
26                          in Licensee's product warranty, to individuals or companies which
                            are affiliated with, associated with, related to, or subsidiaries of
27                          Licensee.   Royalties  shall  be  computed  based  upon  collected
                            payments from Licensee's Net Sales (defined below).
28

2

1
2
3
4
5

**Article 9-Net Sales** "Net Sales" are defined as Licensee's gross sales (i.e., the gross invoice amount billed customers) less: quantity discounts; returns actually received, freight charges, sales tax, use tax or other taxes imposed by governmental agencies. A quantity discount is a discount made at the time of shipment. No deductions shall be made for cash or other discounts, for commissions, for uncollectable accounts, or for fees or expenses of any kind which may be incurred by the licensee in connection with the Royalty payments.

6
7
8
9
10
11
12

**Article 10-Licensed Product Royalty 10.1** Licensee agrees to pay an annual royalty of Five percent (5%) on Net Sales revenue of the Licensed Products ("Licensed Product Royalty" and "Sublicensing Royalty") up to and when the first One Million Linear Feet (1,000,000 l.f) of decking profile is sold in the year commencing upon the effective date of this agreement. When Licensee's sales reach this Licensed Products threshold, a Four percent (4%) royalty will be paid for any Licensed Products or Sublicensed Products sold in this same annual year. This payment percentage schedule shall be implemented every year of the Initial Term and thereafter may be renewed by Licensee under the same terms and conditions for the remaining life of said patent No. 6,594,961, as listed in Schedule C.

13
14
15
16

**10.2** In addition to the Royalty, Licensee agrees to manufacture and sell to the Licensor, over the Initial Term of this Agreement, and the Renewal Term if so renewed, up to Four Hundred and Eighty Thousand linear feet (480,000 l.f.) per year of deck which incorporates the technology of the Licensed Product, at a price agreed upon by both parties. Also components which function with the decking known as Track, removal tool, H-trim, L-Trim and C-Trim, priced and agreed upon by both parties as listed in Schedule D.

17

…

18
19
20

**Article 36-Entire Understanding** This Agreement expresses the complete understanding of the parties and supersedes all prior representations, agreements and understandings, whether written or oral. This Agreement may not be altered except by a written document signed by both parties.

21   License Agreement, Declaration of Eric Benisek ("Benisek Decl."), Ex. A, ECF No. 67-2; DDF

22   4–10.

23            Under the License Agreement, Homeland manufactured and sold the patented

24   product as "Gorilla Lock" vinyl deck product. DUF 12. Homeland sold Gorilla Lock to its

25   distributor customers and also to Leines's Northern California company, Paragon. DUF 13. Over

26   the term of the License Agreement, Homeland sold 1,008,773 linear feet of Gorilla Lock product.

27   DUF 14. Homeland did not apply the five percent royalty rate, as contemplated by Article 10.1,

28   to any sales of Gorilla Lock made to Leines's company, Paragon. DUF 14. Homeland chose not

1  to exercise its renewal rights under Article 26 of the License Agreement; as a result, the initial

2  five-year license term expired on July 31, 2017.  DUF 17.

3          Over the term of the License Agreement, Homeland also manufactured, marketed

4  and sold a product it dubbed Gorilla Deck, a decking installation system similar to Gorilla Lock,

5  but wholly owned and controlled by Homeland.  SAC ¶¶ 12, 32.  Leines alleges Homeland

6  favored its own Gorilla Deck system over Gorilla Lock by failing to utilize best efforts in

7  marketing and selling Gorilla Lock.  *Id.* ¶¶ 32, 45.  Leines believes Homeland's failure to

8  effectively market Gorilla Lock is evidence of its larger strategy to neutralize Gorilla Lock's

9  competitive market share.  *Id.* ¶ 45.

10          Leines alleges that Homeland's conduct over the life of the License Agreement

11  gives rise to the following claims: breach of contract (Count One), breach of express warranty

12  (Count Two), breach of express warranty of merchantability (Count Three), breach of the

13  covenant of good faith and fair dealing (Count Four), false advertising under California Business

14  and Professions Code section 17500 (Count Five), unfair competition under Business and

15  Professions Code section 17200 (Count Six), infringement of the '961 Patent (Count Seven),

16  unfair competition under 15 U.S.C. § 1125(a)) (Count Eight) and fraud in the inducement (Count

17  Nine).  *See generally* FAC.

18          B.    Procedural Background

19          Leines initiated this action on April 19, 2018, Compl., ECF No. 1, and filed the

20  operative first amended complaint on November 28, 2018, FAC.  On December 18, 2018,

21  Homeland answered and brought two counterclaims of its own.  *See* Answer, ECF No. 28.  On

22  February 7, 2020, Leines moved for summary judgment on two claims: breach of contract

23  regarding Homeland's royalty obligations, Pl.'s Contract MSJ, ECF No. 64, and patent

24  infringement, Pl.'s Patent MSJ, ECF No. 65. Homeland opposes both motions, Def.'s Opp'n to

25  Contract MSJ, ECF No. 88; Def.'s Opp'n to Patent MSJ, ECF No. 87.  Leines lodged a reply to

26  both.  Pl.'s Contract Reply, ECF No. 107; Pl.'s Patent Reply, ECF No. 106.

27          Homeland separately moves for summary judgment on a variety of claims and

28  theories alleged in the first amended complaint.  Def.'s MSJ, ECF No. 69.  Leines opposes the

4

1   motion, Pl.'s Opp'n to MSJ, ECF No. 92, and Homeland has replied, Def.'s MSJ Reply, ECF No.

2   108.  Homeland also moves to exclude the expert testimony of three of Leines's witnesses:

3   Dr. Chris Rauwendaal, ECF No. 75, Stephen Daughters, ECF No. 77, and Mark Knudson, ECF

4   No. 79.  Plaintiff opposes each motion to exclude.  ECF Nos. 93–95.  Homeland has replied to all.

5   ECF Nos. 110–12.

6          On May 14, 2020, the court held a telephonic hearing on the motions, given the

7   circumstances occasioned by the coronavirus pandemic.  Counsel Eric Benisek appeared on

8   behalf of plaintiff; counsel Darren Reid, Eric Maxfield, Timothy Getzoff, Brandon Christensen

9   and Laura Goodman appeared for defendant.  After hearing argument, the court submitted the

10  matter for resolution by written order.

11  II.    LEGAL STANDARD

12         A court will grant summary judgment "if . . . there is no genuine dispute as to any

13  material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

14  The "threshold inquiry" is whether "there are any genuine factual issues that properly can be

15  resolved only by a finder of fact because they may reasonably be resolved in favor of either

16  party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

17         As a general matter, the moving party bears the initial burden of showing the

18  district court "that there is an absence of evidence to support the nonmoving party's case."

19  *Celotex Corp.*, 477 U.S. at 325.  The burden then shifts to the nonmoving party, which "must

20  establish that there is a genuine issue of material fact . . . ."  *Matsushita Elec. Indus. Co. v. Zenith*

21  *Radio Corp.*, 475 U.S. 574, 585 (1986).  In carrying their burdens, both parties must "cit[e] to

22  particular parts of materials in the record . . . ; or show [] that the materials cited do not establish

23  the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

24  evidence to support the fact."  Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586

25  ("[The nonmoving party] must do more than simply show that there is some metaphysical doubt

26  as to the material facts").  Moreover, "the requirement is that there be no genuine issue of

27  material fact . . . .  Only disputes over facts that might affect the outcome of the suit under the

28

1   governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at

2   247–48 (emphasis in original).

3   　　　In deciding a motion for summary judgment, the court draws all inferences and

4   views all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at

5   587–88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008). "Where the record taken as a

6   whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

7   issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv.

8   Co.*, 391 U.S. 253, 289 (1968)). Where a genuine dispute exists, the court draws inferences in

9   plaintiffs' favor. *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). Parties may object to evidence cited

10   to establish undisputed facts. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385–86 (9th Cir.

11   2010). A court may consider evidence that would be "admissible at trial." *Fraser*, 342 F.3d at

12   1036. But the evidentiary standard for admission at the summary judgment stage is lenient: A

13   court may evaluate evidence in an inadmissible form if the evidentiary objections could be cured

14   at trial. *See Burch*, 433 F. Supp. 2d at 1119–20. In other words, admissibility at trial depends not

15   on the evidence's form, but on its content. *Block*, 253 F.3d at 418–19 (citing *Celotex Corp.*,

16   477 U.S. at 324). The party seeking admission of evidence "bears the burden of proof of

17   admissibility." *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002). If the

18   opposing party objects to the proposed evidence, the party seeking admission must direct the

19   district court to "authenticating documents, deposition testimony bearing on attribution, hearsay

20   exceptions and exemptions, or other evidentiary principles under which the evidence in question

21   could be deemed admissible . . . ." *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 385–86. However,

22   courts are sometimes "much more lenient" with the affidavits and documents of the party

23   opposing summary judgment. *Scharf v. U.S. Atty. Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979).

24   　　　The Supreme Court has taken care to note that district courts should act "with

25   caution in granting summary judgment," and have authority to "deny summary judgment in a case

26   where there is reason to believe the better course would be to proceed to a full trial." *Anderson*,

27   477 U.S. at 255. A trial may be necessary "if the judge has doubt as to the wisdom of terminating

28   the case before trial." *Gen. Signal Corp. v. MCI Telecomm. Corp.*, 66 F.3d 1500, 1507 (9th Cir.

1    1995) (quoting *Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994)).  This may be the case

2    "even in the absence of a factual dispute."  *Rheumatology Diagnostics Lab., Inc v. Aetna, Inc.*,

3    No. 12-05847, 2015 WL 3826713, at *4 (N.D. Cal. June 19, 2015) (quoting *Black*, 22 F.3d at

4    572); *accord Lind v. United Parcel Serv., Inc.*, 254 F.3d 1281, 1285 (11th Cir. 2001).

5    III.    <u>DISCUSSION</u>

6        A.    <u>Plaintiff's Motion for Summary Judgment: Breach of Royalty Obligations</u>

7            Plaintiff first moves for summary judgment on his first claim for breach of

8    contract.  *See* FAC ¶¶ 50–55; *see generally* Pl.'s Contract MSJ.  Leines argues Homeland

9    breached the License Agreement by withholding royalty payments on net sales to Paragon

10   Systems & Technology, an entity owned by Leines; he argues this exclusion was not permitted

11   under the terms of the License Agreement.  Pl.'s Contract MSJ at 5–6.  Homeland argues Leines

12   misinterprets the plain language of the License Agreement, his interpretation is at odds with the

13   purpose of the Agreement and the parties' mutual understanding and course of conduct.  Def.'s

14   Opp'n to Contract MSJ at 2–10.  Homeland also argues Leines failed to adhere to articles 12 and

15   27 of the Agreement, which granted him audit rights and gave Homeland the opportunity to cure

16   any royalty deficiencies.  *Id.* at 10–11.  Finally, Homeland argues Leines waived the majority of

17   his alleged damages by failing to question quarterly royalty payments within a 24-month period

18   under Article 11 of the License Agreement.  *Id.* at 12–13.

19           It is undisputed California law governs the License Agreement.  DUF 10; License

20   Agreement ¶ 32 ("This Agreement shall be governed in accordance with the laws of the State of

21   California.").  In California, "'[t]he elements of a cause of action for breach of contract are (1) the

22   existence of the contract, (2) plaintiff's performance or excuse for nonperformance,

23   (3) defendant's breach, and (4) the resulting damages to plaintiff.'"  *E.D.C. Techs., Inc. v. Seidel*,

24   216 F. Supp. 3d 1012, 1015 (N.D. Cal. 2016) (quoting *Oasis West Realty, LLC v. Goldman*, 51

25   Cal. 4th 811, 821 (2011)).

26           The first two elements of plaintiff's breach of contract claim are not in dispute.

27   *See* DUF 2 ("Mr. Leines and HVP entered into an exclusive license agreement on July 31,

28   2012."), 3 ("Leines (Licensor) granted an exclusive license to Homeland (a.k.a, the 'Licensee') to

1   make, use, sell, offer to sell, or import 'Licensed Products' . . . in exchange for valuable

2   consideration . . . ."); *see also* Pl.'s Contract MSJ at 5 ("[T]he first two conditions for breach of

3   contract . . . are undisputed.").  And plaintiff requests the issue of damages be reserved for

4   resolution by the jury.  Pl.'s Contract Reply at 8.  Therefore, the only question posed by Leines's

5   summary judgment motion is whether the court can decide as a matter of law that Homeland

6   breached the License Agreement.

7            Article 10.1 of the License Agreement provides that Homeland will pay Leines a

8   five percent royalty on annual net sales revenue of the licensed product, marketed as Gorilla

9   Lock, on the first one million linear feet sold, and four percent on all annual sales thereafter.

10  License Agreement ¶ 10.1.  Article 10.2 provides that Homeland will manufacture and sell four

11  hundred and eighty thousand linear feet (480,000 l.f.) of Gorilla Lock to Leines "at a price agreed

12  upon by both parties."  *Id.* ¶ 10.2.  The License Agreement contains no express language

13  regarding an exclusion of royalty payments on sales made to Leines or his company, Paragon.  *Id.*

14  ¶ 8, 9, 10.1, 10.2; DUF 7.  The Agreement also contains an integration clause providing, "This

15  Agreement expresses the complete understanding of the parties and supersedes all prior

16  representations, agreements and understandings, whether written or oral."  *Id.* ¶ 36.

17           Over the term of the License Agreement, Homeland sold 1,008,773 linear feet of

18  Gorilla Lock.  DUF 14.  It is undisputed Homeland did not apply the five percent royalty fee to

19  the Gorilla Lock sold to Paragon; the royalty was applied, however, to "all sales other than

20  Paragon."  DUF 15, 16.  Leines discovered the royalty shortage he now claims when he

21  conducted an audit of Homeland's royalty reports at the conclusion of the License Agreement

22  term.  DUF 18.  Leines contends, therefore, that by failing to pay royalties on sales to Paragon,

23  Homeland breached the terms of the License Agreement.  Pl.'s Contract MSJ at 3, 5–6.

24           Homeland argues, on the other hand, it did not pay royalties on sales to Paragon

25  because a special pricing discount was built into the Agreement.  Def.'s Opp'n to Contract MSJ at

26  2–6; *see* Second Declaration of Scott Smith ("2nd Smith Decl.") ¶ 7, ECF No. 91 ("Though

27  Homeland typically sold Gorilla Lock to its other customers between approximately $1.58 and

28  $2.797 per linear foot . . . , Homeland sold Gorilla Lock to Leines between approximately $1.05

8

1    and $1.38 per linear foot.").  Thus, Homeland argues, if Leines were also to receive royalty

2    payments on Paragon sales, he would receive an unintended double benefit from the Agreement:

3    a pricing discount as well as royalties.  *Id.*  Homeland argues the objective of the royalty

4    payments were for "Leines to *profit* from Homeland's Gorilla Lock sales to *other customers*—not

5    to merely receive a second back-end discount for cheaper Gorilla Lock each quarter a royalty

6    payment was due to him."  Def.'s Opp'n to Contract MSJ at 2 (emphasis in original).  Put

7    differently, Homeland takes the position the Agreement did not expressly exclude royalties on

8    Paragon sales because those sales do not yield profits to Homeland, and royalties were only

9    intended to be paid on Leines's profits, which could only materialize through sales to other

10   companies, not Paragon.  *Id.*

11                    1.    The Licensing Agreement is Clear and Unambiguous

12            Leines argues the Licensing Agreement is clear and unambiguous, while

13   Homeland says otherwise.  Contract interpretation, including whether a contract is ambiguous, is

14   a matter of law and "[s]ummary judgment is appropriate when the contract terms are clear and

15   unambiguous, even if the parties disagree as to their meaning."  *United States v. King Features*

16   *Entm't, Inc.*, 843 F.2d 394, 398 (9th Cir. 1988); *see also Valve Corp. v. Sierra Entm't Inc.*, 431 F.

17   Supp. 2d 1091, 1095 (W.D. Wash. 2004) ("The interpretation of a contract is a matter of law

18   properly decided on summary judgment.").  Yet, if there "is a material conflict in extrinsic

19   evidence supporting competing interpretations of ambiguous contract language the court may not

20   use the evidence to interpret the contract as a matter of law, but must instead render the evidence

21   to the factfinder for evaluation of its credibility."  *Cachil Dehe Band of Wintun Indians of Colusa*

22   *Indian Cmty. v. California*, 618 F.3d 1066, 1077 (9th Cir. 2010) (citing *City of Hope Nat'l Med.*

23   *Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 395 (2008)).

24            Contract interpretation generally follows a two-step approach.  "[T]he first

25   question to be decided is whether the [disputed] language is 'reasonably susceptible' to the

26   interpretation urged by the party.  If it is not, the case is over."  *People ex rel. Lockyer v. R.J.*

27   *Reynolds Tobacco Co.*, 107 Cal. App. 4th 516, 524 (2003) (citation omitted).  In other words, if

28   the contract language is clear and unambiguous, that language governs.  Cal. Civ. Code § 1638.

1    If the disputed language is "reasonably susceptible to the interpretation urged, the court moves to

2    the second question: what did the parties intend the language to mean?"  *R.J. Reynolds*, 107 Cal.

3    App. 4th at 524 (quotation omitted).  Contract language is ambiguous if it is "capable of more

4    than one reasonable interpretation"; it is then "'the court's task to determine the ultimate

5    construction to be placed on the ambiguous language by applying the standard rules of

6    interpretation in order to give effect to the mutual intention of the parties.'"  *Id.* at 524–25

7    (quoting *Badie v. Bank of America*, 67 Cal. App. 4th 779, 798 (1998)).  Courts will "ascertain that

8    intention solely from the written contract if possible, but also consider the circumstances under

9    which the contract was made and the matter to which it relates."  *Dameron Hosp. Assn. v. AAA N.*

10   *California, Nevada & Utah Ins. Exch.*, 229 Cal. App. 4th 549, 567 (2014) (citing Cal. Civ. Code

11   §§ 1639, 1647.).

12           Leines argues the License Agreement's language is "clear and uncontradicted."

13   Pl.'s Contract MSJ at 5.  Homeland contends there is ambiguity in the Agreement's silence, not

14   its express terms.  Def.'s Opp'n to Contract MSJ at 3 ("[T]he Agreement does not explicitly

15   *exclude* Gorilla Sales to [Leines] from the "Net Sales" royalty calculation . . . [b]ut the Agreement

16   does not explicitly *include* Gorilla Lock sales made to him.  It is silent on the issue." (emphasis in

17   original)).  The License Agreement is silent as to whether the discount on Gorilla Lock sales to

18   Leines at Paragon, "at a price agreed upon by both parties," means royalty payments otherwise

19   due are offset by the discount.  License Agreement ¶ 10.2.  The critical question then is whether

20   the Agreement's silence creates an inherent ambiguity such that the court must turn to extrinsic

21   evidence to ascertain, if possible, the parties' mutual intent at the time the agreement was made.

22   The court answers that question in the negative:  The License Agreement's terms are sufficiently

23   clear, and no ambiguity is created by any omitted provisions.

24           Article 10.1 states in no uncertain terms that Homeland "agrees to pay an annual

25   royalty of five percent (5%) on Net Sales revenue" of Gorilla Lock for the first 1,000,000 linear

26   feet sold per year, and four percent (4%) on every linear foot sold thereafter.  License Agreement

27   ¶ 10.1.  This payment schedule is set forth in Schedule C of the agreement.  *Id.* at 11 (Schedule

28

1   C).  The definition of "Net Sales" in Article 9 provides for certain discounts,[2] returns, charges and

2   taxes to be subtracted from the gross invoice amount billed to customers, but makes no mention

3   of a pricing discount for sales to Paragon.  *Id.* ¶ 9; *see also* Def.'s Opp'n to Contract MSJ at 3

4   ("[T]he Agreement could have explicitly excluded sales of Gorilla Lock to Leines, it did not[.]").

5   Discounts, returns, charges and taxes are not further defined.  License Agreement ¶ 9.

6           As relevant here, Article 8 provides, "All royalties . . . provided for under this

7   Agreement shall accrue when the respective Licensed Products are *sold*, billed, and paid for."  *Id.*

8   ¶ 8 (emphasis added).  Article 10.2, which is a subsection under Article 10 titled "Licensed

9   Product Royalty," provides that Homeland "agrees to manufacture and *sell*" 480,000 l.f. to Leines

10  at an agreed upon price.  *Id.* ¶ 10.2 (emphasis added).  Taken together, these provisions establish

11  that the royalty rate applied to all sales, except for those that may be exempt under the definition

12  of "Net Sales" explained above.  *Id.* ¶ 9.  No straightforward reading of the Agreement allows the

13  conclusion that sales to Paragon were exempted.

14          Moreover, Article 10.2 also states that, "In *addition* to the Royalty," Homeland

15  agrees to manufacture and sell the 480,000 l.f. of Gorilla Lock to Leines at Paragon "at a price

16  agreed upon by both parties."  *Id.*  ¶ 10.2 (emphasis added).  The phrase "[i]n addition to the

17  Royalty" signals the arrangement for sales of Gorilla Lock to Paragon was on top of, and

18  supplemented, the Royalty terms, rather than a carve-out to the royalties due.  *See* Merriam-

19  Webster, https://www.merriam-webster.com/dictionary/addition (last visited July 17, 2020)

20  (defining phrase "in addition to" as "combined or associated with")).  Neither the Agreement's

21  definition of "Net Sales," nor the phrase "price agreed upon by both parties," include language

22  limiting the imposition of royalties on Homeland's sales to Leines or his company, Paragon.  The

23  agreement also contains no details regarding what price was "agreed upon by both parties" for

24  those sales, and does not say that the agreed price will have any effect on the royalty obligations.

25  _____

26      [2]  While Homeland argues now that its sales to Paragon reflected a "discount," nothing in
    the agreement characterized the sales it would make to Paragon as a "quantity discount," which
27  would be excluded from "Net Sales."  To the extent Homeland's arrangement with Paragon might
    be described as another type of discount, Article 9 clarifies "[n]o deductions shall be made . . . for
28  other discounts" and so forecloses this reading.  License Agreement ¶ 9.

1    Reading all of the relevant provisions of the Agreement together, the Agreement provides for

2    Homeland to pay royalties on its sales of the licensed product to Paragon.  *Cf. Brown v.*

3    *Goldstein*, 34 Cal. App. 5th 418, 435 (2019) (considering agreement as a whole to determine if

4    ambiguity exists), *review denied* (July 31, 2019).

5            Rather than pointing to a specific word or phrase whose interpretation the parties

6    dispute, Homeland asks the court to resort directly to extrinsic evidence to locate ambiguity.  If a

7    court is to consider extrinsic evidence to resolve an ambiguity, "it is essential" the evidence be

8    tethered "to particular language" in the agreement.  *Alameda Cty. Flood Control & Water*

9    *Conservation Dist. v. Dep't of Water Res.*, 213 Cal. App. 4th 1163, 1188 (2013).  Homeland does

10   not identify specific language because, as Homeland argues, it is the absence of language that

11   creates the ambiguity.[3]  *Compare* Def.'s Opp'n to Contract MSJ at 3 ("Homeland agrees with

12   Leines that the Agreement does not explicitly *exclude* Gorilla Sales to him from the "Net Sales"

13   royalty calculation . . . [nor] explicitly *include* Gorilla Lock sales made to him." (emphases in

14   original)), *with, e.g.*, *Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 392 (2006) (considering

15   whether phrase "at will" was ambiguous); *Am. Alt. Ins. Corp. v. Superior Court*, 135 Cal. App.

16   4th 1239, 1247 (2006) (considering whether phrases "physical damage" and "damaged property"

17   were ambiguous).  The practical effect of Homeland's request is that the court must read into the

18   Agreement a provision that otherwise does not exist in order to provide a basis for consulting

19   extrinsic evidence.

20           The problem with Homeland's request is that "extrinsic evidence cannot be used to

21   add a provision to the contract that was omitted by the parties."  *Alameda Cty. Flood Control*, 213

22   Cal. App. 4th at 1190; *Dameron Hosp. Assn.*, 229 Cal. App. 4th at 569 ("[c]ourts will not add a

23

---

24   [3]  When asked at hearing about the introductory language of Article 10.2, "In addition to the
     royalty," Homeland's counsel did not argue this language is ambiguous.  Rather, counsel argued,
25   "the way we read that, your Honor, is that you have the royalty, and then in addition to that, you
     have this other obligation to make sales to the patent holder. So there are two separate things in
26   this license agreement. . . . It's clear that the license of the party's intent, with respect to this
     agreement, was that Homeland would not pay a royalty on sales to Mr. Leines."  Hr'g Tr., ECF
27   No. 122, at 47:16–48:3.

28

term about which a contract is silent" (citation omitted)).  The court's "function is to determine what, in terms and substance, is contained in the contract, not to insert what has been omitted. [Courts] do not have the power to create for the parties a contract that they did not make and cannot insert language that one party now wishes were there."  *Dameron Hosp. Assn.*, 229 Cal. App. 4th at 569 (quoting *Vons Companies, Inc. v. United States Fire Ins. Co.*, 78 Cal. App. 4th 52, 58–59 (2000)); *Integral Dev. Corp. v. Tolat*, No. 12-CV-06575-JSW (JSC), 2016 WL 8929073, at *6 (N.D. Cal. Dec. 23, 2016) (court's role limited to "interpret[ing] the terms of the contract, [] not to add, subtract, or vary the words of the written agreement.").  For this reason, Homeland's argument suggesting Leines's course of performance illuminates the parties' true intentions, Def.'s Opp'n to Contract MSJ at 5–6 (arguing "actions speak louder than words"; quoting *Crestview Cemetery Ass'n v. Dieden*, 54 Cal. 2d 744, 754 (1960)), calls for a modification after the fact, not for clarification of an ambiguity the court cannot find within the four corners of the parties' agreement, *Tolat*, 2016 WL 8929073, at *6 (turning to extrinsic evidence only "[b]ecause the plain language of the Settlement Agreement leaves room for both parties' interpretations").

       Even if the court were to rely on Homeland's extrinsic evidence, that evidence provides no indication Leines became aware the royalty discrepancy he claims immediately, or was contractually obligated to audit the royalty statements such that he should have been aware sooner.  *See F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958, 966 (9th Cir. 2010) (failure to object to royalty statements did not show knowing acquiescence until the point statements were audited).  It is undisputed that although Leines had received several royalty statements over the term of the License Agreement, he did not perform an internal audit of the royalty statements until December 20, 2017.  DUF 18; Declaration of Richard Leines ("Leines Decl.) ¶ 4, ECF No. 107-4, Ex. B (Leines's December 22, 2017 audit letter to Homeland).  Homeland's evidence showing Leines's lack of objection to royalty statements prior to the December 22, 2017 audit has no bearing on his alleged acquiescence to Homeland's interpretation of the royalty agreement.  Moreover, the Agreement itself appears to preclude a finding as a matter of law that failure to object to royalty statements amounted to acquiescence.  *See* License Agreement ¶ 11 ("The

1   acceptance by Licensor of any of the statements furnished or Royalties paid shall not preclude

2   Licensor from questioning the correctness at any time of any payments or statements . . . .").

3   Finally, while the Agreement grants Leines the "right . . . to inspect and audit" Homeland's

4   records, it imposes no duty that he do so.  *Id.* ¶ 12.  Leines's failure to perform immediate or

5   quarterly audits does not equate to a knowing acquiescence in Homeland's interpretation of the

6   royalty rates due under the agreement.

7            Leines does concede his damages are time-barred under Article 11 of the License

8   Agreement, which limits royalty challenges to a 24-month period from a statement's issuance,

9   Pl.'s Contract Reply at 8; therefore, his damages are limited to those arising from royalty

10   statements issued and payments made after December 22, 2015.

11            In sum, the court finds the License Agreement clearly and unambiguously sets the

12   royalty terms and Homeland breached those terms by failing to make royalty payments on sales to

13   Leines's company, Paragon.

14       B.      Motions for Summary Judgment: Patent Infringement and Invalidity

15            Both parties move for summary judgment with respect to the '961 Patent itself:

16   Leines on infringement and Homeland on invalidity based on indefiniteness.  *See* Pl.'s Patent

17   MSJ; Def.'s MSJ at 17–22.  In short, Leines alleges he is the owner of a valid U.S. patent, the

18   '961 Patent, and Homeland infringed Claim 11 of the patent when it continued to sell previously

19   authorized material, Gorilla Lock, beyond the License Agreement's authorization period.  Pl.'s

20   Patent MSJ at 1.  Conversely, Homeland moves for summary judgment on plaintiff's patent

21   infringement claim, arguing the '961 Patent is indefinite or lacks the required written description

22   under 35 U.S.C. § 112.  Def.'s MSJ at 17.  Alternatively, Homeland contends, in opposition to

23   Leines's summary judgment motion, there are genuine disputes of material fact regarding whether

24   the '961 Patent is anticipated by the prior art, is obvious in light of the prior art, and, regardless,

25   that certain sales were permitted by the License Agreement.  Def.'s Opp'n to Patent MSJ at 2–16.

26            In his own summary judgment reply, Leines argues that patent invalidity is an

27   entirely separate issue from infringement because invalidity is an affirmative defense applicable

28

14

1   to the question of infringement liability, not whether infringement actually occurred.  *See*

2   *generally* Pl.'s Patent Reply.

3           It is true, as Leines asserts, that infringement and validity are distinct questions,

4   *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 135 S. Ct. 1920, 1928 (2015); however, it is

5   also true the issue of invalidity, as an affirmative defense and potential bar to liability, may render

6   the question of infringement moot.  *See* Answer to FAC, ECF No. 28, at 9 (asserting affirmative

7   defense for patent invalidity); *see also Lufthansa Technik AG v. Astronics Advanced Elec. Sys.*

8   *Corp.*, 196 F. Supp. 3d 1190, 1196 (W.D. Wash. 2016) (finding because patent was invalid it

9   could not be infringed and dismissing infringement claims on that basis), *aff'd on other grounds*,

10   711 F. App'x 638 (Fed. Cir. 2017); *Epic Games, Inc. v. Acceleration Bay LLC*, No. 4:19-CV-

11   04133-YGR, 2020 WL 1557436, at *3 (N.D. Cal. Apr. 1, 2020) ("The Supreme Court has

12   expressed a preference for deciding issues of patent validity independent of any infringement

13   claim in order to prevent wasteful re-litigation and provide final resolution to accused infringers."

14   (citing *Cardinal Chem. Co. v. Mortin Int'l, Inc.*, 508 U.S. 83, 100–01 (1993)).  If Homeland's

15   summary judgment motion for invalidity based on indefiniteness fails, then the question of

16   infringement raised by Leines's summary judgment motion becomes relevant.

17           1.    Is the '961 Patent Invalid Because it is Indefinite?

18           A patent must "conclude with one or more claims particularly pointing out and

19   distinctly claiming the subject matter which the applicant regards as the invention."  *Media Rights*

20   *Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1371 (Fed. Cir. 2015) (alteration omitted)

21   (quoting 35 U.S.C. § 112(b)).  A patent will be found "invalid for indefiniteness if its claims, read

22   in light of the specification delineating the patent, and the prosecution history, fail to inform, with

23   reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus, Inc. v.*

24   *Biosig Instruments, Inc. (Nautilus I)*, 572 U.S. 898, 901 (2014).  "Definiteness is measured from

25   the viewpoint of a person skilled in the art at the time the patent was filed."  *Kaneka Corp. v.*

26   *Zhejiang Med. Co.*, No. CV 11-02389 SJO (SHSx), 2018 WL 2718036, at *5 (C.D. Cal. Apr. 5,

27   2018) (citing *Nautilus I*, 572 U.S. at 908), *aff'd sub nom. Kaneka Corp. v. Xiamen Kingdomway*

28   *Grp. Co.*, 767 F. App'x 998 (Fed. Cir. 2019)).  Ultimately, "a claim is indefinite if its language

1   'might mean several different things and no informed and confident choice is available among the

2   contending definitions.'" *Media Rights*, 800 F.3d at 1371 (quoting *Nautilus I*, 572 U.S. at 911

3   n.8).

4          "A patent is presumed valid under 35 U.S.C. § 282 and, 'consistent with that

5   principle, a [fact finder is] instructed to evaluate . . . whether an invalidity defense has been

6   proved by clear and convincing evidence.'" *Biosig Instruments, Inc. v. Nautilus, Inc. (Nautilus*

7   *II)*, 783 F.3d 1374, 1377 (Fed. Cir. 2015) (alteration in original) (quoting *Microsoft Corp. v. I4I*

8   *Ltd. P'ship*, 564 U.S. 91, 131 S. Ct. 2238, 2241 (2011)).  General principles of claim construction

9   apply to allegations of invalidity based on indefiniteness. *Id.* (citation omitted).  In that regard,

10  the court must "primarily consider the intrinsic evidence, *viz.*, the claim language, the

11  specification, and the prosecution history." *Id.* (quoting *Enzo Biochem, Inc. v. Applera Corp.*

12  *(Enzo I)*, 599 F.3d 1325, 1332 (Fed. Cir. 2010)).  The court may also rely on extrinsic evidence,

13  for example, to better understand relevant scientific principles that inform a disputed term. *Enzo*

14  *Biochem Inc. v. Applera Corp. (Enzo II)*, 780 F.3d 1149, 1153 (Fed. Cir. 2015).

15         Homeland argues the following terms in Claim 11 are indefinite or lack the written

16  description required by 35 U.S.C. § 112:

17     • "A deck board which can be attached to an underlying surface easily in one

18        downward motion and with a simple clip;"

19     • "[S]aid deck board can be connected smoothly and securely to a clip

20        having a pair of outwardly facing flanges while maintaining a uniform

21        alignment of said elongated deck board over said surface;"

22     • "[Y]et can be readily disconnected."

23  Def.'s MSJ at 17–18.  The court addresses each phrase in turn.

24         a)   "Can Be Attached to An Underlying Surface Easily"

25         Homeland argues Claim 11's preamble phrase "[a] deck board which can be

26  attached to an underlying surface easily" is limiting, as evidenced by the patent's prosecution

27  history, and thus indefinite because it fails to "provide an objective standard for determining if an

28

1    attachment is easy or difficult." *Id.* at 18.  In an effort to establish the phrase is subjective,

2    Homeland cites the deposition testimony of Leines's expert Douglas Todd in which he states, "If

3    I could do it, it's easy.  I don't know—I don't know how you would define it." *Id.* at 20 (citing

4    Third Declaration of Brandon Christensen ("Third Christensen Decl."), Ex. J (Todd Dep.), ECF

5    No. 84-9).  Todd's testimony, Homeland contends, "demonstrates the lack of any objective

6    boundary and fails to provide a standard for determining whether something was performed

7    'easily,'" thus making Claim 11 indefinite under § 112(b). *Id.*

8            Leines argues the term "easily" is not indefinite because Homeland misreads the

9    patent's prosecution history in an attempt to "transform the preamble into a limitation."  Pl.'s

10   Opp'n to MSJ at 11.  Nonetheless, Leines says, "easily" is not indefinite because it is a term of

11   degree that "inform[s] those skilled in the art about the scope of the invention with reasonable

12   certainty." *Id.* at 14 (alteration in original) (quoting *Nautilus I*, 572 U.S. at 910).

13          The court need not decide whether "easily" constitutes a limitation in the preamble

14   because Homeland ultimately fails to meet its burden to show there is no genuine question of fact

15   but that "easily" is indefinite under § 112.  Homeland relies only on the deposition testimony of

16   Leines's expert Douglas Todd for support; however, as Leines correctly highlights, the full scope

17   of Todd's testimony is properly construed as averring that the degree of ease would be readily

18   apparent to one skilled in the art based on experience and comparison to work typically

19   performed in the field:

20          Q: How do you know if an attachment is easy or not?

21          A: If you're familiar with the product, it has a — a track. . . .  And, I
             mean, a lot of time, I've — I've had boards sitting on a deck and
22          accidentally step on them, and they go on.  That's easy.

23          . . .

24          Q: So what objective standard would you use to determine whether
             an attachment is easy?
25          A: If I could do it, it's easy.  I don't know how you would define it.
26
27          . . .

28          Q: How much force must someone apply before the attachment is not
             easy, in your view?

17

1   A: Well, if you're doing — let's say you're doing Brock deck, you
have to use a dead blow hammer.  And every joist, you have to hit it
2   three times on the right, left, and center.  And that is — that is a lot
— pretty hard.  Put it that way.  Where the Premier decking is very
3   easy.  If you compare those two.

4   Q: What if you only have to hit the board with one dead blow
hammer.  Is that easy?

5
A: On the Brock deckling, you have to hit it three times.

6
. . .

7
Q: So even if you use a hammer, it could be defined as easy in your
8   view[?]

9   A: You have to use a dead blow hammer.  You can't use a regular
hammer, or it will bust.  You don't get it much easier than that.  I
10  mean, Premier is the easiest one to put on all the deckings.

11  . . .

12  Q: What level of effort would constitute a difficult attachment?

13  A: When you're putting decking on all day long and your arm feels
like it's going to fall off at the end of the day, that's hard.

14

15  Todd Dep. 32:7–34:21.

16          This testimony would allow a finder of fact to conclude Gorilla Lock's ease of

17  installation is readily apparent to an experienced practitioner in the field.  Moreover, while Todd

18  did not articulate a precise definition, *id.* 34:2–4, he nonetheless confined the scope of relative

19  ease by way of comparison to similar products and instruments in the field, *id.* 33:13–18.  Todd

20  reached the same conclusion in a prior declaration.  *See* Todd Claim Construction Decl. ¶ 17,

21  ECF No. 37-1 ("It is my opinion that the preamble of claim 11, viewed in light of the

22  specification and prosecution history, informs those skilled in the art about the scope of the

23  invention with reasonable certainty.").  Homeland provides no expert testimony of its own in

24  support of its assertion that "easily" is not readily understood by those in the art.

25          Because "[t]erms of degree are not inherently indefinite," *Inline Plastics Corp. v.*

26  *Lacerta Grp., Inc.*, 415 F. Supp. 3d 243, 248 (D. Mass. 2019) (citing *Interval Licensing LLC v.*

27  *AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014)), and Homeland fails to meet its evidentiary

28

1    burden here, the court finds the term "easily" is sufficiently defined for purposes of surviving

2    Homeland's summary judgment challenge.

3              b)    "Can Be Connected Smoothly and Securely to a Clip"

4              Homeland argues the phrase "can be connected smoothly and securely to a clip" is

5    indefinite for failure to provide objective boundaries.  Def.'s MSJ at 20.  Specifically, Homeland

6    asserts "[t]he patent fails to define or provide an objective standard for determining whether a

7    connection is smooth."  *Id.*  Homeland once again relies on the deposition testimony of Douglas

8    Todd for support, arguing his testimony establishes the term "'smoothly' depends on the

9    installer's subjective perspective."  *Id.* at 21.  In opposition, Leines asserts the specification and

10   prosecution history adequately defines "smoothly" and, once again, Homeland mischaracterizes

11   Todd's testimony.  Pl.'s Opp'n to MSJ at 16–17.

12             Here too Leines is correct, for purposes of summary judgment.  The patent's

13   specification describes the connection process as the installer applying downward force on the

14   deck plank "so that the weight of the installer causes inwardly sloping surfaces in the slot under

15   the plank to ride over [the] flanges . . . whereby the deck plank engages and attaches to [the]

16   clip."  '961 Patent, ECF No. 85-10, at col. 6:15–25.  The prosecution history similarly describes

17   the connection process.  *See* Prosecution History, ECF No. 85-1, at RL000111 ("The spaced-up

18   flanges in conjunction with the ledges allow the deck plank to be installed smoothly since the

19   ramps to the ledges in the plank recess will allow the outside-facing flanges to ride over the ramps

20   easily and smoothly.").  Finally, Homeland's reliance on the deposition testimony of Douglas

21   Todd is hardly conclusive given the statements Todd also makes in his declaration.  *See, e.g.*,

22   Todd Claim Construction Decl. ¶ 25 ("It is my opinion that one of skill would understand the

23   nature of the smooth connection of the clip riding up the ramps of the ledges.").  Homeland

24   presents no affirmative evidence of its own to the contrary.

25             In light of the specification delineating the patent and the prosecution history, the

26   term "connected smoothly" is not indefinite such that summary judgment is appropriate.

27

28

c)      "Yet Can Be Readily Disconnected"

Homeland argues the term "readily disconnected" is indefinite because it fails to provide objective boundaries.  Def.'s MSJ at 21.  It further argues the specification provides no clarification because it uses the similarly subjective term "little effort" to describe the removal process, *id.* (citing '961 Patent at col. 8:18–20), as does the prosecution history through use of terms such as "removed easily" and "difficult to insert," *id.* at 21–22 (citing Prosecution History at RL000170).  Homeland also asserts that Todd's deposition testimony renders the word "readily" superfluous and thus "wholly subjective."  *Id.* at 22 (citing Todd Dep. 45:13–23, 46:16–48:9).  In opposition, Leines argues the patent specifications and history provide adequate specificity in both their direct characterization and comparison to prior art.  Pl.'s Opp'n to MSJ at 17–19.

Taking account of the '961 Patent's specifications, prosecution history and the testimony of Douglas Todd, the court finds the term "readily disconnected" is not indefinite for summary judgment purposes.  The background of prior art describes the Yoder patents, U.S. Patent Nos. 5,009,045 and 5,950,377, as labor intensive, often requiring professional help, "difficult to disengage (e.g., for remodeling) without damage to plank or clip," and "not able to span existing joist spacing easily when replacing a deck surface."  '961 Patent at col. 1:37–52. Leines's '961 Patent, on the other hand, boasts of a "deck plank which can be disengaged readily with little effort."  *Id.* at col. 2:48–49.  The specification then describes a removal process in which:

> [O]ne inserts tool 41 (FIG. 7), which has a greater length than the space between retaining flanges 52 and 54, under deck plank 12 into elongated recess 29 at one end of the deck plank.  The worker then turns tool 41 ninety degrees using a standard socket wrench.  This forces the flanges outward and thereby separates the end of the deck plank from ledges 42 and 44, releasing the end from the retaining flange projections 52 and 54 of the clip.  The end of the deck plank can now be lifted and removed and in the same manner the rest of the deck plank can be separated and removed off the clips.

*Id.* at col. 6:25–36.

1        Moreover, the prosecution history describes how "the elevated position or spaced-

2   up position of the flanges and ledges enables the planks to be removed easily by a suitable

3   removal tool."  Prosecution History at RL000109.  Finally, in his declaration Todd avers that, in

4   his opinion, the "specification describes an attachment mechanism that allows using a tool to

5   engage the clip to release the connection with the ledges on the sidewall of the center groove

6   performs [sic] the disconnection readily."  Todd Claim Construction Decl. ¶ 36.

7        Taken together, these explanations adequately define the term "readily

8   disconnected" such that it is not indefinite under § 112 for purposes of summary judgment.

9              d)    Conclusion

10   In sum, applying the test set forth in *Nautilus, Inc. v. Biosig Instruments, Inc.*,

11   572 U.S. 898, 901 (2014), the court finds for purposes of this motion the terms "easily,"

12   "smoothly" and "readily" are defined with the specificity required by § 112.

13              2.    Patent Infringement

14        Having found Claim 11's disputed terms satisfy § 112, the court next turns to the

15   issue of infringement raised by Leines's motion.  In doing so, it notes that Homeland does not

16   move for summary judgment based on its additional affirmative defenses that the '961 Patent is

17   invalid as anticipated prior art and obvious in light of the prior art.  *See* Def.'s Opp'n to Patent

18   MSJ at 2–13.  In other words, Homeland has not called on the court to determine if Homeland's

19   affirmative defenses of anticipation and obviousness are a complete bar to liability; its raising the

20   issues in opposition to Leines's summary judgment motion does not require the court resolve

21   them here in a dispositive ruling.  This is because an affirmative defense raised in opposition to

22   summary judgment may serve to undermine the moving parties' request to granting judgment in

23   its favor, but is not properly construed as a request to grant summary judgment for the non-

24   moving party on the affirmative defense.  *See McCollough v. Johnson, Rodenberg & Lauinger*,

25   587 F. Supp. 2d 1170, 1176 (D. Mont. 2008) ("A plaintiff moving for summary judgment is not

26   obligated to negate affirmative defenses, but an affirmative defense will negate summary

27   judgment where each element of the affirmative defense is supported by summary judgment

28   evidence."), *aff'd,* 637 F.3d 939 (9th Cir. 2011).  Indeed, to grant summary judgment on an

1   affirmative defense requires finding  "no genuine dispute of fact" after applying the standard

2   applicable to all summary judgment claims.  *See Synbiotics Corp. v. Heska Corp.*, 137 F. Supp.

3   2d 1198, 1201 (S.D. Cal. 2000). Here,  Homeland appears to concede the evidence in support of

4   its anticipation and obvious defenses is not conclusive.  Def.'s Opp'n to Patent MSJ at 2 ("There

5   are genuine disputes of material fact with respect to the '961 Patent's anticipation by the prior

6   art."), 4 ("There are Genuine Disputes of Material Fact as to Whether the '961 Patent was

7   Obvious in Light of the Prior Art.").  Thus,  the only question before the court is whether there

8   are genuine disputes of fact regarding whether Homeland infringed Claim 11 of the '961 Patent

9   that defeat granting summary judgment.  *See Taser Int'l, Inc. v. Stinger Sys., Inc.*, 705 F. Supp. 2d

10  1115, 1154 (D. Ariz. 2010) ("Courts routinely enter summary judgment concerning infringement,

11  saving questions of validity for trial.").  The court answers that question in the negative, as

12  explained below.

13          Article 28 of the License Agreement states that upon termination of the license, all

14  rights granted to Homeland will revert back to Leines and Homeland shall "refrain from further

15  manufacturing, copying, marketing, distribut[ing] or us[ing] any" of the Gorilla Lock product not

16  in Homeland's "customer order backlog, inventory or work-in-process" on the date of

17  termination. License Agreement ¶ 28.  Within 30 days of termination, Homeland was required to

18  provide Leines with an inventory statement listing the Gorilla Lock products it had in its

19  possession or was in the process of manufacturing.  *Id.*  Under the Agreement, Homeland was

20  permitted to "continue manufacturing [Gorilla Lock] to satisfy [its] customer backlog

21  obligations" and sell any remaining Gorilla Lock "in its inventory and work-in-process" by the

22  date of termination.  *Id.*  Homeland was prohibited from conducting any further manufacturing,

23  sales or distribution beyond 120 days from the termination date.  *Id.*

24          The following relevant facts are undisputed.  Homeland "licens[ed] the '961

25  Patent's technology," which includes patent Claim 11.  Def.'s Opp'n to Patent MSJ at 1; DUF 19,

26  31–39.  The License Agreement terminated on July 31, 2017 by virtue of Homeland's failure to

27  renew the Agreement.  DUF 17.  Homeland made two sales of Gorilla Lock after November 30,

28  2017, beyond the 120-day limitation period provided in Article 28).  DUF 25, 29.  One such sale

1   was to a buyer named Vinyl By Design on January 24, 2018.  DUF 30.  Homeland effectively

2   concedes these two sales infringed the '961 Patent, and confirmed as much at hearing.  *See* Def.'s

3   Opp'n to Patent MSJ at 13 (arguing only that "five other unlicensed sales after the termination of

4   the license" did not infringe '961 Patent).  Therefore, based on the undisputed facts, plaintiff is

5   entitled to summary judgment with respect to Homeland's two sales made after November 30,

6   2017, the end of the 120-day limitation period in Article 28 of the License Agreement.

7           As to the "five other sales" made after the July 31, 2017 Agreement termination

8   date, but before the November 30, 2017 cutoff, Leines does not meet his burden of showing that

9   no genuine dispute of material fact remains.  As a threshold matter, Leines's assertion that

10  Homeland waived its defense regarding these sales by failing to raise a "license" affirmative

11  defense is without merit.  *See* Pl.'s Patent Reply at 4 n.2 (citing *Worldwide Church of God v.*

12  *Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000)).  Leines's argument

13  miscomprehends Homeland's position, which is that the "License Agreement permitted these

14  sales."  Def.'s Opp'n to Patent MSJ at 13.  As Homeland also clarified at hearing, the issue is one

15  of performance under the License Agreement itself.  Semantics aside, Homeland's counterclaims

16  do assert that its operations were authorized under the License Agreement.  *See* Counterclaims

17  ¶¶ 30, 32, ECF No. 28.  To the extent a "license" defense must be affirmatively stated, Homeland

18  did not waive the defense because it raised the issue in its counterclaims.

19          Second, the parties agree Homeland conducted five separate transactions during

20  the relevant period as reflected by invoice numbers 190412, 192218, 189679, 190770 and

21  191865, DUF 28 (undisputed as to existence of invoices reflecting the transactions); however, a

22  dispute remains regarding whether these transactions were permitted under the terms of the

23  agreement, DDF 28 (asserting invoiced transactions were "permitted by the License Agreement").

24  Homeland offers the declaration of Scott Smith, Homeland's controller, describing the nature of

25  each invoice and its corresponding purchase order.  2nd Smith Decl. ¶¶ 9–13.  This evidence,

26  Homeland contends, shows these transactions qualified as permitted "customer backlog" or

27  "work-in-progress" under the winddown period defined in Article 28.  Def.'s Opp'n to Patent

28  MSJ at 15.

23

Leines, on the other hand, argues Article 28 sets forth a precondition, that before Homeland can exercise its rights under the "customer backlog" or "work-in-progress" provisions, it must first provide Leines with an inventory list, within 30 days of expiration of the License Agreement. Pl.'s Patent Reply at 4. Because it is undisputed Homeland did not provide an inventory list within the 30-day period, *see* DUF 24, Leines argues Homeland "cannot now claim the benefit of [] Article [28]," Pl.'s Patent Reply at 4. Leines's position is unavailing, on summary judgment. Homeland's evidence it says shows the validity of the "five other sales" relates to the question of infringement, not patent validity; therefore, it cannot be said this evidence is limited to the question of liability and thus cannot be considered on summary judgment here. *See id.* (arguing sale authorization not defense to question of infringement). Moreover, the License Agreement does not contain an express condition restraining Homeland's post-termination sales absent the provision of an inventory list to Leines. Article 28 suggests the opposite by limiting Homeland's use except for materials "not in [its] customer order backlog, inventory or work-in-process" by the termination date. License Agreement ¶ 28. Thus, Leines fails to meet his burden of showing there is no disputed question of material fact with respect such that the court can find as a matter of law that Homeland's five sales between July 31, 2017 and November 31, 2017 were infringing.

Summary judgment is granted in Leines's favor as to the two sales taking place after November 31, 2017, but denied as to the "five other sales" between July 31, 2017 and November 31, 2017.

3.  Conclusion

For the reasons set forth above, Homeland's motion for summary judgment is denied as to its indefiniteness affirmative defense. Leines's motion for summary judgment is granted as to the two sales made after November 31, 2017 but denied as to the "five other sales" made between July 31, 2017 and November 31, 2017.

C.      Homeland's Motion for Summary Judgment

Homeland's motion for summary judgment attacks a number of claims and legal theories framed by the first amended complaint, other than the patent validity issue discussed above.  The balance of Homeland's summary judgment motion is addressed here.

1.      "Unreimbursed Warranty Costs"

Homeland moves for summary judgment of Leines "unreimbursed warranty costs," arguing they are too speculative to survive.  Def.'s MSJ at 2–3.  Specifically, Homeland argues Leines has suffered no actual injury, but rather claims likely future injury based on the assumption that Gorilla Lock will inevitably fail for lack of structural integrity, leaving him exposed to an avalanche of warranty claims.  *Id.* at 3.  Homeland further argues that Leines has not, and will not, incur damage because Homeland's lifetime warranty covers defective products for homeowners.  At hearing, Homeland's counsel confirmed these alleged "warranty costs" amount to an unpled legal theory by Leines.

Leines argues his alleged damages are not speculative because Homeland failed to provide the insurance coverage promised under Article 24 of the License Agreement, thus leaving him exposed to defect claims potentially uncovered by Homeland's warranty guarantee if customers invoke the warranty in the future.  Leines relies on the expert testimony of Dr. Chris Rauwendaal opining that all Gorilla Lock installed in the Discovery Bay and South Lake Tahoe areas is defective.  Pl.'s Opp'n to MSJ at 24.  Leines also argues he owes a legal duty to his own customers, and if Homeland is unable or unwilling to cover its warranty obligations, then Leines himself will be exposed to the lurking warranty claims.  *Id.* at 25.

Leines's alleged warranty costs are too speculative to survive summary judgment. To meet the "irreducible constitutional minimum" of Article III standing, Leines "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not

1    conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560).  A concrete injury is

2    one that "must actually exist." *Id.*  If the claimed injury is one of future harm, standing exists

3    only if the injury is "*certainly impending*."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409

4    (2013) (emphasis in original) (citation omitted).  "Allegations of *possible* future injury are not

5    sufficient." *Id.* (emphasis in original) (alteration and internal quotation omitted).

6            Leines argues he suffered a concrete injury when Homeland failed to provide the

7    insurance coverage contemplated by Article 24 of the License Agreement, thus exposing him to

8    potential claims based on "alleged defects."  Pl.'s Opp'n to MSJ at 24.  Leines also admits,

9    however, that Homeland is legally obliged "to cover **all** the homeowner's costs associated with

10   the replacement of defective Gorilla Lock," and that he "will not be exposed to warranty costs" so

11   long as Homeland continues to satisfy its warranty duties.  *Id.* at 25 (emphasis in original).

12   Leines then provides a list of contingencies that he says, if not met, will leave him exposed to

13   customer warranty claims.  *See id.* ("[T]his leaves Leines at the whim of HVP as to whether

14   (i) HVP will agree to cover each particular warranty claim, (ii) HVP can afford the continued

15   coverage of warranty claims in light of the scope of the Gorilla Lock problem, and (iii) HVP will

16   remain in business to cover these claims.").  Still, Leines concedes whether he ever faces the

17   impending damages he forecasts depends on "whether HVP will continue to cover these costs and

18   protect [him]." *Id.*

19          The undisputed evidence shows that Article 23 provides for Homeland to cover

20   customers' lifetime warranty costs and the warranty claims on defective Gorilla Lock products;

21   all the evidence of record shows Homeland has covered these costs thus far.  PUF 27, 31–32.

22   Leines presents no evidence of warranty claims lodged against him personally based on sales

23   made by Homeland.  As noted, he does not dispute that it is Homeland, not Leines, that owes a

24   legal duty to its customers for defective products covered under the lifetime warranty provision.

25   PUF 40 ("Leines has no contractual obligation to pay for customers' warranty claims out of his

26   own pocket."), 41 ("Leines has not paid the cost of any warranty claims made on Gorilla Lock."),

27   42 ("No homeowner has tried to hold Leines liable for any warranty-related costs or damages.").

28   Even if, as Leines contends, there are questions about the quality and safety of the Gorilla Lock

product, *see* Rauwendaal Rep., ECF No. 84-2, Doug Gayner Decl. ("Gayner Decl.") ¶¶ 5–7, ECF No. 99; Douglas Todd Decl. ("Todd Decl.") ¶¶ 5–7, ECF No. 98, and the potential for exposure from a lapse in or failure to purchase the insurance coverage required by the License Agreement, Leines does not provide evidence explaining which particular potential claims might leave him exposed.  As Leines himself admits, the insurance coverage called for under Article 24 is a form of "back-up protection," but "[a]s long as HVP continues to cover all the costs associated with Gorilla Lock warranty claims, [he] will be protected."  Pl.'s Opp'n to MSJ at 26.  There is no evidence, on this record, to support the conclusion that Leines will be or is even likely to be exposed to uncovered liabilities.

Further, that Homeland might one day breach its warranty duty under Article 23, and may have breached its duty under Article 24  by failing to provide "back-up" insurance, does not alleviate Leines's burden ultimately to prove damages to a reasonable degree of approximation.  Damages are, of course, an essential element of a breach of contract claim.  *E.D.C. Techs.,* 216 F. Supp. 3d at 1015.  "Where the fact of damages is certain . . . the amount of damages need not be calculated with absolute certainty.  The law requires only that some reasonable basis of computation be used, and the result reached can be a reasonable approximation."  *Acree v. Gen. Motors Acceptance Corp.*, 92 Cal. App. 4th 385, 398 (2001).  Leines fails to present evidence of a "reasonable approximation" of what his liability exposure might be so as to withstand summary judgment.  Instead, he points only to the expert testimony of Stephen Daughters, CPA, who opines that Leines will be exposed to "unreimbursed warranty costs" totaling $2,823,999.  *See* Daughters Rep. ¶ 67, ECF No. 84-3.  This estimation does not delineate which warranty claims will remain uncovered by Homeland's lifetime warranty obligations.  In other words, the certainty of Leines's liability exposure is dependent on the "whim" of Homeland's willingness and ability to cover its warranty obligations, which is insufficient at this stage.

For these reasons, Homeland's motion for summary judgment as to plaintiff's "unreimbursed warranty costs" is granted.

1          2.          False Advertising Claims

2                    In his opposition, Leines voluntarily dismisses his false advertising claims under

3   California Business & Professions Code section 17500, as well as the Lanham Act claim based on

4   advertisements of Gorilla Lock and his damages suit under Business & Professions Code section

5   17200.  Pl.'s Opp'n to MSJ at 19 n.15.[4]  The court deems those claims dismissed with prejudice.

6   The sole remaining false advertising claim is brought under the Lanham Act based on

7   Homeland's advertising of Gorilla Deck (the "Gorilla Deck Advertising Claim").  *See* Def.'s MSJ

8   Reply at 5.

9                    A false advertising claim under the Lanham Act § 43(a), codified at 15 U.S.C.

10  § 1125(a),[5] requires: (1) a false statement of fact by the defendant in a commercial advertisement

11  about its own or another's product; (2) the statement actually deceived or has the tendency to

12  deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to

13  influence the purchasing decision; (4) the defendant caused its false statement to enter interstate

14

---

15          [4]  Leines also seeks to reserve his right to seek injunctive relief under section 17200 based
    on patent infringement.  Pl.'s Opp'n to MSJ at 19 n.15.  The first amended complaint, however,
16  alleges only "unauthorized manufacture and sale of Gorilla Deck products" in relation to his
    section 17200 claim.  Gorilla Deck is not the product covered by the License Agreement, *see*
17  License Agreement ¶ 2.2; DUF 12; FAC ¶ 32; therefore, Leines has no standing to seek injunctive
    relieve for infringement of technology to which he does not claim rights.  Leines's claim for
18  injunctive relief under section 17200 is also dismissed for this reason.

19          [5] In pertinent part, 15 U.S.C. § 1125(a) provides:

20                    (1) Any person who, on or in connection with any goods or services,
                      or any container for goods, uses in commerce any word, term, name,
21                    symbol, or device, or any combination thereof, or any false
                      designation of origin, false or misleading description of fact, or false
22                    or misleading representation of fact, which--

23                    (A) is likely to cause confusion, or to cause mistake, or to deceive as
                      to the affiliation, connection, or association of such person with
24                    another person, or as to the origin, sponsorship, or approval of his or
                      her goods, services, or commercial activities by another person, or
25
                      (B) in commercial advertising or promotion, misrepresents the
26                    nature, characteristics, qualities, or geographic origin of his or her or
                      another person's goods, services, or commercial activities,
27
                      shall be liable in a civil action by any person who believes that he or
28                    she is or is likely to be damaged by such act.

1   commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false

2   statement, either by direct diversion of sales from itself to defendant or by a lessening of the

3   goodwill associated with its products. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134,

4   1139 (9th Cir. 1997).  To demonstrate falsity, "a plaintiff may show that the statement was

5   literally false, either on its face or by necessary implication, or that the statement was literally true

6   but likely to mislead or confuse consumers." *Id.* (citing *Castrol Inc. v. Pennzoil Co.*, 987 F.2d

7   939, 943, 946 (3d Cir.1993)).

8          Homeland argues summary judgment should be granted on the remaining Gorilla

9   Deck Advertising Claim because (1) it lacks the particularity required for pleading Lanham Act

10  claims, (2) the Gorilla Deck advertising is not literally false, (3) Leines presents no evidence the

11  advertisements are material, (4) he also presents no evidence the advertisements are deceptive,

12  (5) he cannot prove he has been or is likely to be injured by the advertisements, and (6) the claim

13  is time barred. *Id.* at 5–9.  Leines contends "there can be no doubt that the complained of Gorilla

14  Deck advertisements are literally false," and material disputes remain regarding whether he can

15  prove likely injury due to the false advertising and whether his Lanham Act claim is time barred.

16  Pl.'s Opp'n to MSJ at 19–23.  Leines further argues Homeland waived its particularity pleading

17  argument by failing to raise it in a 12(b)(6) motion to dismiss.  *Id.* at 22–23.

18         The first amended complaint alleges Homeland "falsely represented the quality

19  and various aspects of [] its . . . Gorilla Deck product[,]" and the "public and purchasers of the . . .

20  Gorilla Deck products have been actually deceived because they have received defective

21  products." FAC ¶¶ 96–97.  The complaint further alleges Homeland "was able to sell a

22  substantial amount of Gorilla Deck" based on its deceptive statements. *Id.* ¶ 98.  Homeland first

23  argues these allegations are insufficient because they constitute an unpled legal theory subject to

24  the particularity requirements of Rule 9(b).  Def.'s MSJ at 9–10.  As noted, Leines argues

25  Homeland waived this defense by failing to raise it in a 12(b)(6) motion to dismiss and,

26  regardless, the first amended complaint and subsequent disclosures and interrogatories provided

27  Homeland with sufficient notice of Leines's false advertising theory regarding Gorilla Deck.

28  Pl.'s Opp'n to MSJ at 22–23.

1    The court finds Homeland did not waive its particularity defense by failing to raise

2    it in a 12(b)(6) motion to dismiss.  Federal Rule of Civil Procedure 12(h) governs defense

3    waivers.  Rule 12(h)(1) provides that a party waives any of the defenses enumerated in Rule

4    12(b)(2)–(5) by failing to raise the defense under a variety of circumstances.  Fed. R. Civ. P.

5    12(h)(1).  Under Rule 12(h)(2), however, a defense for failure to state a claim upon which relief

6    may be granted may be raised "(A) in any pleading allowed or ordered under Rule 7(a); (B) by a

7    motion under Rule 12(c); or (C) at trial."  Fed. R. Civ. P. 12(h)(2).  While some courts interpret

8    this rule restrictively by limiting use of such a defense to the three circumstances described in the

9    rule, *see, e.g.*, *Brooks v. Monroe Sys. for Bus., Inc.*, 873 F.2d 202 (8th Cir. 1989), others view the

10   rule liberally and permit use of such a defense at any point prior to trial, *see, e.g.*, *Yumul v. Smart*

11   *Balance, Inc.*, No. CV 10-00927 MMM, 2011 WL 1045555, at *5 (C.D. Cal. Mar. 14, 2011)

12   (permitting defendant to "raise [its 12(b)(6)] defense any time prior to or during trial").  "Since

13   the basic purpose of Rule 12(h)(2) probably is to preserve the defenses, rather than to delimit the

14   precise timing of their assertion, this latter approach seems sound and within the spirit, if not the

15   letter, of the provision."  5C Charles Alan Wright & Arthur R. Miller, *Federal Practice. &*

16   *Procedure* § 1392 (3d ed. 2020).  Accordingly, Homeland may attack the sufficiency of the first

17   amended complaint here.

18   As to the sufficiency of the allegations themselves, it is true, as Leines asserts, the

19   Ninth Circuit has yet to decide the applicability of Rule 9's heightened pleading standards to a

20   Lanham Act claim for false advertising, Pl.'s Opp'n to MSJ at 22; nonetheless, this court sides

21   with those finding that, because Lanham Act claims are grounded in fraud, Rule 9 applies.  *See*

22   *Bobbleheads.com, LLC v. Wright Bros., Inc.*, 259 F. Supp. 3d 1087, 1095 (S.D. Cal. 2017)

23   ("[T]he Court agrees with the weight of authority that Rule 9(b) applies to Lanham Act claims

24   that are grounded in fraud."); *EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp.*, 711 F.

25   Supp. 2d 1074, 1085 (C.D. Cal. 2010) ("The Court agrees that Plaintiff's false advertising claims

26   are grounded in fraud and that Rule 9(b) applies to the pleading of this claim."); *LT Int'l Ltd. v.*

27   *Shuffle Master, Inc.*, 8 F. Supp. 3d 1238, 1245 (D. Nev. 2014) (applying Rule 9 to fraud-based

28   allegations under Lanham Act).  Rule 9 requires plaintiff plead "the who, what, when, where, and

1   how of the misconduct charged."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir.

2   2003) (internal quotations omitted).

3            The first amended complaint not only fails to satisfy the particularity requirements

4   of Rule 9, but it essentially forecloses any false advertising claim based on Gorilla Deck.  In

5   conclusory fashion, the complaint alleges Homeland "falsely represented the quality and various

6   aspects" of Gorilla Deck product and the public and purchasers of "Gorilla Deck products have

7   been actually deceived because they have received defective products."  FAC ¶¶ 96–97.  These

8   allegations lack any specifics regarding the manner Homeland in which advertised its Gorilla

9   Deck product.  Moreover, as Homeland highlights, paragraph 38 of the operative complaint,

10  which describes in detail Leines's false advertising allegations, appears to foreclose any false

11  advertising claim related to Gorilla Deck because the allegations focus exclusively on Gorilla

12  Lock.  Paragraph 38 states that "Homeland's marketing materials regarding the Licensed Products

13  are knowingly untrue," and includes a list of allegedly false statements.  *Id.* ¶ 38.  The term

14  "Licensed Products," however, does not include Gorilla Deck.  *Id.* ¶ 16 ("'Licensed Products' . . .

15  which included Gorilla Lock product"); DUF 12 ("Pursuant to the License Agreement,

16  [Homeland] manufactured and sold Licensed Products which were marketed as "Gorilla Lock"

17  vinyl deck product.").  The detailed false advertising allegations, therefore, contain no mention of

18  Gorilla Deck.  Consequently, Leines's Gorilla Deck Advertising Claim fails.

19           Even if the claim were sufficiently pled, it is still barred by California's three-year

20  statute of limitations for fraud-based allegations, which applies to Lanham Act claims.  *See Karl*

21  *Storz Endoscopy Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 857 (9th Cir. 2002)

22  ("[Plaintiff's] Lanham Act claims are subject to a three-year statute of limitations which began to

23  run upon [its] actual or constructive knowledge of the wrong." (citing Cal. Civ. Proc. Code

24  § 338(d)).  The limitation period is not triggered, however, "until the discovery, by the aggrieved

25  party, of the facts constituting the fraud or mistake."  *Kline v. Turner*, 87 Cal. App. 4th 1369,

26  1373–74 (2001) (internal quotations omitted).  "[D]iscovery in this context [] mean[s] not when

27  the plaintiff became aware of the specific wrong alleged, but when the plaintiff suspected or

28  should have suspected that an injury was caused by wrongdoing."  *Id.* at 1374.  In other words,

1   the statute "begins to run when the plaintiff has information which would put a reasonable person

2   on inquiry." *Id.* "'[I]f an action is brought more than three years after commission of the fraud,

3   plaintiff has the burden of pleading and proving that he did not make the discovery until within

4   three years prior to the filing of his complaint.'" *Cansino v. Bank of Am.*, 224 Cal. App. 4th

5   1462, 1472 (2014) (quoting *Hobart v. Hobart Estate Co.*, 26 Cal. 2d 412, 437 (1945)).

6          Here, it is undisputed Homeland uploaded the Gorilla Deck promotional brochure

7   to its website in November 2014.  PUF 89.  It is also undisputed Leines inspected samples of the

8   Gorilla Deck product in November 2014, and shortly thereafter, in November or December 2014,

9   he received sample shipments of Gorilla Deck.  PUF 92, 93.  It is clear Leines had the Gorilla

10  Deck product in his possession at the time Homeland actively promoted it on its website; he was,

11  therefore, on notice that sales and therefore promotional efforts had begun as of November 2014.

12  Because the initial complaint, ECF No. 1 (filed April 19, 2018), and the first amended complaint

13  (filed November 28, 2018), were filed beyond the three-year limitations period, Leines must

14  plead and prove he did not have actual or inquiry notice of the fraudulent conduct until a later

15  date.  The first amended complaint is void of any allegations of delayed notice.  *See generally*

16  FAC.  Moreover, despite Leines contention he did not review the Gorilla Deck brochures until

17  right about the time he filed this case, Pl.'s Opp'n to MSJ at 23 (citing Leines Decl. ¶ 13), his

18  actual knowledge is not required because Homeland's active advertisement on its website,

19  combined with his possession of Gorilla Deck product samples, leaves no genuine dispute of fact

20  as to whether a reasonable person would have been on inquiry notice of the alleged fraudulent

21  advertising as of November 2014. As Homeland argued at hearing, Leines had both opportunity

22  and motive to view the Gorilla Deck promotional materials when they were released for the

23  specific purpose of ensuring Homeland's marketing campaign treated Gorilla Deck and Gorilla

24  Lock equally.  *Cf.*  FAC ¶ 45 (confirming Leines's concerns given allegations that Homeland

25  failed to market Gorilla Lock in any meaningful way).  Leines fails to plead or show why a

26  reasonable person in his position would not be on notice of facts leading to discovery of the

27  alleged fraud as of November 2014.  *See Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017,

28  1024 (9th Cir. 2008) ("A plaintiff must affirmatively excuse his failure to discover the fraud

1    within three years by showing that he was not negligent in failing to make the discovery sooner

2    and that he had no actual or presumptive knowledge of facts sufficient to put him on inquiry."

3    (citation and internal quotations omitted)).

4              Homeland's motion for summary judgment is granted as to plaintiff's Lanham

5    Act claim for false advertising related to the Gorilla Deck Advertisement.

6              3.    Breach of Contract: Failing to Meet Manufacturing Obligation

7              The first amended complaint alleges Homeland breached Article 10.2 of the

8    License Agreement by failing to manufacture and sell 480,000 linear feet of Gorilla Lock to

9    Leines every year.  FAC ¶ 37.  The complaint attributes "Homeland's constant manufacturing and

10   quality control issues" for the failure.  *Id.*

11             Homeland moves for summary judgment, arguing that, as a matter of law, the

12   Agreement clearly and unambiguously permits "*up to* 480,000 linear feet of Gorilla Lock" be

13   manufactured and sold to Leines per year, and it is not a minimum supply or purchase agreement.

14   Def.'s MSJ at 22-23 (emphasis in original).  Leines argues Homeland misinterprets the nature of

15   his claim, which is not that Article 10.2 created a minimum supply or purchase contract, but that

16   Homeland's various non-performance issues, such as failure to use "best efforts" to bring the

17   licensed product to market and breach of the covenant of fair dealing, frustrated and obstructed

18   his ability to purchase more Gorilla Lock than he actually did.  Pl.'s Opp'n to MSJ at 7.  Leines

19   admits "there is no dispute regarding the plain language of Article 10.2 of the License

20   Agreement."  *Id.* at 10.  In Reply, Homeland believes Leines's admission is dispositive and

21   summary judgment should be entered in its favor.  Def.'s MSJ Reply at 4–5.

22             Contract interpretation is a matter of law appropriate for resolution on summary

23   judgment.  *King Features Entm't, Inc.*, 843 F.2d at 398.  Here, however, there is no interpretation

24   question before the court.  The parties agree the language of Article 10.2 is clear and

25   unambiguous.  Pl.'s Opp'n to MSJ at 7; Def.'s MSJ Reply at 4–5.  The heart of Leines's claim is

26   that Homeland's performance hindered his ability to purchase "up to" 480,000 linear feet of

27   Gorilla Lock per year, and neither party moves for summary judgment on that question.

28   Homeland's argument at hearing, that it is entitled to summary judgment because Leines presents

1   no evidence Homeland hindered his ability to purchase "up to" 480,000 linear feet, misses the

2   mark.  As noted above, in its moving papers, Homeland framed the issue as one of contract

3   interpretation, not one of undisputed evidence related to contract performance.  Homeland cannot

4   now demand summary judgment based on a lack of evidentiary support for a claim it did not

5   challenge in the first instance.

6          Accordingly, Homeland's motion for summary judgment is denied as to the

7   alleged breach of Article 10.2.

8          4.       Fraud in the Inducement

9          Finally, Homeland moves for summary judgment as to Leines's cause of action for

10  fraud in the inducement.  Homeland first argues the claim is barred by the statute of limitations

11  because the claim accrued when he signed the License Agreement and this matter was filed at

12  least three years beyond the limitation period. Def.'s MSJ at 23–24.  In the alternative, Homeland

13  argues Leines's fraud in the inducement claim fails on the merits because he (1) failed to allege

14  certain "acrylic representations" were false or that he relied upon them to his damage, (2) failed to

15  allege the "quality control representations" were false, and (3) failed to allege the "quantity

16  representation" was false or that Homeland knew it was false.  *Id.* at 24–27.

17         Regarding Homeland's statute of limitations defense, Leines argues that pleading

18  delayed discovery is irrelevant where questions of fact exist at summary judgment.  Pl.'s Opp'n to

19  MSJ at 2–4.  He also argues Homeland's motion fails on the merits because questions of fact

20  remain as to whether he has established the acrylic representation was false and he relied on it to

21  his detriment, that "high quality" and "rigorous quality control program" representations were

22  false, and that Homeland's promise to use "best efforts" was material and he relied on that

23  promise to his detriment.  *Id.* at 4–7.

24         As with Leines's false advertising claim, so too is his fraud in the inducement

25  claim barred by the statute of limitations.  As reviewed above, when a complaint is filed beyond

26  the statutory limitation period, a plaintiff must allege reasons for delay at the onset.  *Cansino*,

27  224 Cal. App. 4th at 1472; *Clemens*, 534 F.3d at 1024   As Homeland correctly argues, it is the

28  initiating pleadings that frame the issues to be fleshed out in discovery, and unpled theories find

1  no shelter when raised for the first time at summary judgment.  Def.'s MSJ Reply at 2 (citing

2  *Wasco Prod., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 991 (9th Cir. 2006) ("[F]ederal courts

3  have repeatedly held that plaintiffs seeking to toll the statute of limitations on various grounds

4  must have included the allegation in their pleadings; this rule applies even where the tolling

5  argument is raised in opposition to summary judgment.")); *see also Wasco*, 435 F.3d at 991

6  (citing *389 Orange St. Partners v. Arnold*, 179 F.3d 656, 662–63 (9th Cir. 1999) ("affirming

7  summary judgment because of plaintiff's failure to 'allege with particularity any fraudulent

8  activity.'")).

9       The first amended complaint alleges Randall Heath, Homeland's president, made

10  false statements to induce Leines to sign the License Agreement.  FAC ¶ 103.  Fraud in the

11  inducement is subject to California's three-year statutory limitations period, Cal. Code Civ. Proc.

12  § 338(d); because the License Agreement was signed on July 31, 2012, PUF 103, Leines must

13  allege facts justifying why the complaint was filed beyond the three-year limitation window.  *See*

14  *Hacker v. Homeward Residential, Inc.*, 26 Cal. App. 5th 270, 282 (2018) ("An action for fraud

15  . . . accrues when a plaintiff first learns that a fraud may have occurred, so long as he or she could

16  have confirmed the fraud through further investigation.").  The first amended complaint is devoid

17  of facts or allegations explaining when Leines might have reasonably discovered or been on

18  notice of the alleged fraudulent activity.  *See generally* FAC; *see also* Pl.'s Opp'n to MSJ at 2–4

19  (identifying no allegations in complaint suggesting delayed discovery).  When a plaintiff's

20  "complaint shows on its face that his claim would be barred without the benefit of the discovery

21  rule[, he] must specifically plead facts to show (1) the time and manner of discovery and (2) the

22  inability to have made earlier discovery despite reasonable diligence."  *Fox v. Ethicon Endo-*

23  *Surgery, Inc.*, 35 Cal. 4th 797, 808 (2005) (alterations and citation omitted).  Because the first

24  amended complaint contains no such allegations, Leines's fraud in the inducement claim is

25  statutorily barred.

26       D.     Homeland's Motions to Exclude

27       To the extent the court has relied on the depositions of expert witnesses Dr. Chris

28  Rauwendaal, Stephen Daughters and Mark Knudson, Homeland's motions to exclude these

witnesses' opinions are denied.  Homeland may renew the motions in the form of motions *in limine* prior to trial.

IV.    CONCLUSION

The motions for summary judgment, ECF Nos. 64, 65 and 69, and motions to exclude, ECF Nos. 75, 77 and 79, are resolved as follows:

- Plaintiff's motion for summary judgment, ECF No. 64, for breach of contract as to royalty payments: GRANTED, with damages limited to royalty statements and payments after December 22, 2015;

- Plaintiff's motion for summary judgment, ECF No. 65, for infringement of the '961 Patent: GRANTED as to sales taking place after November 31, 2017, but DENIED as to the "five other sales" occurring between July 31, 2017 and November 31, 2017;

- Defendant's motion for partial summary judgment, ECF No. 69, as to multiple claims and theories:

   o    DENIED as to defendant's indefiniteness affirmative defense;

   o    GRANTED as to plaintiff's "unreimbursed warranty costs";

   o    GRANTED as to plaintiff's Lanham Act claim for false advertising related to the Gorilla Deck advertisement;

   o    DENIED as to plaintiff's breach of contract claim regarding defendant's manufacturing and sales obligations under Article 10.2;

   o    GRANTED as to plaintiff's fraud in the inducement claim;

- Defendant's motions to exclude the expert testimony of Dr. Chris Rauwendaal, ECF No. 75, Stephen Daughters, ECF No. 77, and Mark Knudson, ECF No. 79: DENIED as moot, but subject to renewal as motions *in limine*.

- A final pretrial conference is set for **September 25, 2020 at 10 a.m.**, with a joint pretrial status report due no later than twenty-one (21) days prior.

   IT IS SO ORDERED.

DATED:  July 20, 2020.

_____
CHIEF UNITED STATES DISTRICT JUDGE