Gayle L. Gough (SBN 154398)
Laura L. Goodman (SBN 142689)
GOUGH & HANCOCK LLP
Two Embarcadero Center, Suite 640
San Francisco, CA 94111
Telephone: 415-848-8900
gayle.gough@ghcounsel.com
laura.goodman@ghcounsel.com

Eric G. Maxfield (pro hac vice)
Darren G. Reid (pro hac vice)
Timothy P. Getzoff (pro hac vice)
Brandon T. Christensen (pro hac vice)
HOLLAND & HART LLP
222 South Main Street, Suite 2200
Salt Lake City, UT 84101
Telephone: (801)799-5833
Facsimile: (801)799-5700
egmaxfield@hollandhart.com
dgreid@hollandhart.com
tpgetzoff@hollandhart.com
btchristensen@hollandhart.com

*Attorneys for Defendant
Homeland Vinyl Products, Inc.*

## IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD A. LEINES,<br><br>Plaintiff,<br><br>v.<br><br>HOMELAND VINYL PRODUCTS, INC.,<br><br>Defendant. | Case No. 2:18-cv-00969-KJM-DB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION IN LIMINE #1 TO EXCLUDE TESTIMONY OF DR. CHRIS RAUWENDAAL**<br><br>Judge Kimberly J. Mueller<br>Magistrate Judge Deborah Barnes<br>Date: March 4, 2022<br>Time: 10:00 a.m.<br>Location: Courtroom No. 3<br>Trial Date: April 5, 2022 |

# TABLE OF CONTENTS

**Page No(s).**

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................... 1

ARGUMENT .......................................................................................................... 4

I.    DR. RAUWENDAAL'S OPINIONS ARE PRECLUDED BY THE ORDER. ............ 5

II.    DR. RAUWENDAAL'S OVERARCHING METHODOLOGY IS UNRELIABLE, CONTRIVED, RESULTS-ORIENTED, AND INCONSISTENT WITH INDUSTRY STANDARDS AND RULE 702 ..................... 6

        A.    Dr. Rauwendaal's Admission That He Did Not Conduct an "Objective Analysis" is Fatal to All His Opinions. ................................................. 6

        B.    Dr. Rauwendaal Ignores Facts and Data that Contradict His Opinions and Rigs the Results of His Analysis in Leines' Favor. ..................................... 8

        C.    Dr. Rauwendaal's Opinions on Internal Wall Thickness Rest Only on One Unidentified and Uninstalled Profile Sample. ........................................... 11

        D.    Dr. Rauwendaal's Analysis of Alleged Dimensional Discrepancies in 25 Pieces of Gorilla Lock Lacks Foundation and is Contrived and Unreliable. ........................................................................................................ 15

        E.    Dr. Rauwendaal's Reliance on Intertek's Purported Testing of Gorilla Lock Lacks Foundation and is Wholly Improper and Unreliable. ................... 16

III.    DR. RAUWENDAAL CANNOT BACKDOOR UNDISCLOSED EVIDENCE AND ANALYSIS INTO HIS REPORT THROUGH IMPROPER TESTIMONY. ......................................................................................................... 18

CONCLUSION ...................................................................................................... 21

CERTIFICATE OF SERVICE .............................................................................. 22

# TABLE OF AUTHORITIES

Page No(s).

## CASES

*Arjangrad v. JPMorgan Chase Bank, N.A.*,
   No. 3:10-CV-01157-PK, 2012 WL 1890372 (D. Or. May 23, 2012) ...................................12

*Ash Grove Cement Co. v. Employers Ins. of Wausau*,
   246 F.R.D. 656 (D. Kan. 2007) ..................................................................................17

*Ask Chemicals, LP v. Computer Packages, Inc.*,
   593 F. App'x 506 (6th Cir. 2014) .................................................................................7

*Baker v. Firstcom Music*,
   No. LA16CV08931VAPJPRX, 2018 WL 2676636 (C.D. Cal. May 8, 2018).......................7

*Barber v. United Airlines, Inc.*,
   17 F. App'x 433 (7th Cir. 2001) ..................................................................................12

*Beck's Office Furniture & Supplies, Inc. v. Haworth, Inc.*,
   1996 WL 466673, 94 F.3d 655 (10th Cir. 1996).................................................................16

*Champagne Metals v. Ken-Mac Metals, Inc.*,
   458 F.3d 1073 (10th Cir. 2006) ....................................................................................7

*Ciomber v. Coop. Plus, Inc.*,
   527 F.3d 635 (7th Cir. 2008) .......................................................................................18

*CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*,
   815 F. Supp. 2d 673 (S.D.N.Y. 2011) ..........................................................................7

*Concord Boat Corp. v. Brunswick Corp.*,
   207 F.3d 1039 (8th Cir. 2000) ....................................................................................12

*Craig v. Xlear, Inc.*,
   No. 2:16-CV-00392-DB-EJF, 2019 WL 1119429 (D. Utah Mar. 11, 2019) ........................8

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) ...........................................2, 4, 12

*David Cousyn for Cousyn Grading & Demo, Inc. v. Ford Motor Co.*,
   No. EDCV172051DOCKKX, 2019 WL 6434922 (C.D. Cal. July 17, 2019).......................18

*Dodge v. Cotter Corp.*,
   328 F.3d 1212 (10th Cir. 2003) ....................................................................................4

*Encompass Ins. Co. v. Berger*,
   2014 WL 12597120 (C.D. Cal. Aug. 12, 2014) ...............................................................4

*Hill v. Koppers Indus.*,
   No. CIV.A. 3:03CV60-P-D, 2009 WL 3246630 (N.D. Miss. Sept. 30, 2009) .........18, 19, 20

*In re Cessna 208 Series Aircraft Prods. Liab. Litig.*,
   No. 05-md-1721-KHV, 2009 WL 1357234 (D. Kan. May 12, 2009).................................20

*In re Nat'l Coll. Athletic Ass'n Athletic Grant-in-Aid Antitrust Litig.*,
No. 14-MD-02541 CW, 2018 WL 4241981 (N.D. Cal. Sept. 3, 2018) ........................10, 11

*Kaseberg v. Conaco, LLC*,
No. 15-CV-1637 JLS (MSB), 2019 WL 1641161 (S.D. Cal. Apr. 16, 2019) ....................10

*Kennedy v. Collagen Corp.*,
161 F.3d 1226 (9th Cir. 1998) ...................................................................................4

*King-Indiana Forge, Inc. v. Millennium Forge, Inc.*,
No. 1:07-cv-00341-SEB-DML, 2009 WL 3187685 (S.D. Ind. Sept. 29, 2009) ..................6

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ...............................................................................................4, 6

*Lantec, Inc. v. Novell, Inc.*,
No. 2:95-CV-97-ST, 2001 U.S. Dist. LEXIS 24816 (D. Utah Feb. 13, 2001) ....................8

*Luke v. Family Care & Urgent Med. Clinics*,
323 F. App'x 496 (9th Cir. 2009)...............................................................................4

*Mooring Capital Fund LLC v. Knight*,
388 F. App'x 814 (10th Cir. 2010).............................................................................7

*Nebraska Plastics, Inc. v. Holland Colors Americas, Inc.*,
408 F.3d 410 (8th Cir. 2005) ...............................................................................10, 12

*Nelson v. Sandvik Mining & Const., Inc.*,
No. 10-CV-5778-RBL, 2012 WL 6056547 (W.D. Wash. Dec. 6, 2012)............................20

*Nkemakolam v. St. John's Military Sch.*,
No. 12-2132-JWL, 2014 WL 695740 (D. Kan. Feb. 24, 2014) ....................................16, 17

*Pharmanetics, Inc. v. Aventis Pharm., Inc.*,
No. 5:03-CV-817-FL(2), 2005 WL 6000369 (E.D.N.C. May 4, 2005), *aff'd,* 182 F.
App'x 267 (4th Cir. 2006) ........................................................................................2

*Rothbaum v. Samsung Telecomm. Am., LLC*,
52 F. Supp. 3d 185 (D. Mass. 2014).....................................................................7, 8, 12

*Smith v. Pac. Bell Tel. Co.*,
649 F.Supp.2d 1073 (E.D.Cal. 2009) .........................................................................12

*TAMKO Bldg. Prod., Inc. v. Factual Mut. Ins. Co.*,
890 F. Supp. 2d 1129 (E.D. Mo. 2012) ......................................................................2

## OTHER AUTHORITIES

Fed. R. Civ. P. 26 .....................................................................................................4

Fed. R. Civ. P. 26(a)(2) ........................................................................................18, 19

Fed. R. Civ. P. 26(a)(2), 37(c)(1) ................................................................................4

Fed. R. Evid. 702 ............................................................................................. passim

### INTRODUCTION

The Court should exclude the opinion and report of Dr. Chris Rauwendaal, Leines' "structural engineering" expert, pursuant to the Court's July 21, 2020 summary judgment order ("Order") and Rule 702 of the Federal Rules of Evidence.[1]  Rauwendaal purports to render an expert opinion that all of Homeland's Gorilla Lock installed in the field is "defective," based on the sampling of a single specimen.  Specifically:

1.    Dr. Rauwendaal admits he conducted no "objective analysis" of the evidence and no inspection of Gorilla Lock installed in the field;

2.    His report and opinions lack reliability and foundation because (a) he ignores much of the information he was allowed to consider, including evidence contradicting his opinions; (b) he has no knowledge about the Gorilla Lock samples described in his report; and (c) he merely assumes as true Leines' unsubstantiated, self-serving claim that every linear foot of Gorilla Lock installed in the field is defective due to its structural integrity or mechanical strength.  Each of these failings is fatal.

In a stunning change of course, Leines has argued that "Dr. Rauwendaal's opinion is that HVP appears to be statistically incapable of manufacturing Gorilla Lock to specification *and not 'if' and 'when' Gorilla Lock will actually fail in the field*."[2]  This is demonstrably false.  The ultimate conclusion of Dr. Rauwendaal's report is that Gorilla Lock will fail structurally in the field, *i.e.*, Gorilla Lock's structural dimensions have "***led to serious problems in the field, likely requiring replacement of 400,000 feet of decking material***" and the alleged structural issues "present a very serious safety issue" that "means that ***the product is much more likely to fail***"

---

[1]  Homeland previously filed motions to exclude the expert testimony of Dr. Chris Rauwendaal (Dkt. 75-76), Stephen Daughters (Dkt. 77-78), and Mark Knudson (Dkt. 79-80).  The Order denied those motions as moot, but held they were "subject to renewal as motions in limine." (Dkt. 124-36.)  Accordingly, Homeland renews those same motions, including raising new arguments in light of the Order granting summary judgment as to several of Leines's claims. Although Homeland filed a similar motion in advance of the Final Pretrial Conference (Dkt. 144-145), out of an abundance of caution and to ensure all the motions in limine are before the Court, Homeland has refiled this motion.

[2]  Plaintiff's Opposition to Defendant's Motion to Exclude Testimony of Dr. Chris Rauwendaal (Dkt. 95) ("Rauwendaal Opposition"), 8 (emphasis added).

than product meeting Homeland's alleged specifications.[3]  Dr. Rauwendaal's sweeping

conclusion was the sole basis for Leines's damages expert, Stephen Daughters, calculating that

Leines will incur $2,823,999 in alleged "unreimbursed warranty costs" for all Gorilla Lock.[4]

As a threshold matter, because the Court granted summary judgment on Leines's wildly

speculative claim for nearly $3 million in "unreimbursed warranty costs," Dr. Rauwendaal's

conclusions in Sections 1 and 7 of his report should be excluded because they will be irrelevant

to any of Leines' remaining damages theories, no longer helpful to the trier of fact, and

prejudicial to Homeland.[5]  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591, 113 S.

Ct. 2786, 2795, 125 L. Ed. 2d 469 (1993) ("Expert testimony which does not relate to any issue

in the case is not relevant and, ergo, non-helpful."); *TAMKO Bldg. Prod., Inc. v. Factual Mut.

Ins. Co.*, 890 F. Supp. 2d 1129, 1143 n.4 (E.D. Mo. 2012) (granting motions to exclude "because

the testimony of those witnesses is no longer relevant in light of [] summary judgment rulings");

*Pharmanetics, Inc. v. Aventis Pharm., Inc.*, No. 5:03-CV-817-FL(2), 2005 WL 6000369, at *24-

27, 35-36 (E.D.N.C. May 4, 2005), *aff'd,* 182 F. App'x 267 (4th Cir. 2006).  Leines has tried to

shift the locus of Dr. Rauwendaal's opinions to a mere discussion of Homeland's alleged

"negligent manufacturing" in failing to produce Gorilla Lock with internal walls that met

Homeland's specifications.  To be clear, however, Leines has not pled and there does not exist a

claim for negligence, negligent manufacturing, or any such related damages in this case.[6]

---

[3]  Expert Report of Chris Rauwendaal, attached to the Tenth Christensen Declaration ("10CD") as **Exhibit A**, at 14-15 (emphasis added).

[4]  Expert Report of Stephen Daughters, ¶¶ 66-67 (attached to the 10CD as **Exhibit B**).

[5]  (Dkt. 124-27.)  Though Leines alleges in his First Amended Complaint that Homeland breached Article 16 of the Agreement (count one) and the covenant of good faith and fair dealing (count four) by failing to manufacture Gorilla Lock to meet Homeland's alleged specifications, Daughters has not calculated any damages from such a breach.  He limits Leines' monetary damages to six discrete theories, and only his calculation of "unreimbursed warranty costs" is based on Dr. Rauwendaal's conclusion.

[6]  Rauwendaal Opposition, 1, 4; First Amended Complaint (Dkt. 27).  Leines's new "failure to meet specifications" argument is a red herring.  Homeland could make its Gorilla Lock according to any dimensional specifications it wanted to—it had no contractual or legal obligation to Leines to do otherwise.  Leines' statement that "HVP does not dispute it is supposed to scrap—and not sell to the public—Gorilla Lock that does not meet specification" is false.  *Id.* at 10.

Dr. Rauwendaal's speculative conclusion—the installed Gorilla Lock is entirely defective—is linked to Leines's alleged damages solely through Daughters' expert opinion in Section 3 of his report:

> [I]t is possible an additional 311,939 linear feet may be defective and need replacement. . . . Per Chris Rauwendaal's report, it appears likely that ***all of Gorilla Lock manufactured by HVP is defective and fails to meet basic industry standard safety testing for its advertised use.*** I have calculated the reimbursement warranty costs that would be required should all the product be considered faulty. Based on the most recent average replacement cost per linear foot of $9.05, unreimbursed warranty costs total $2,823,999.[7]

Because the Court granted summary judgment as to Leines's "unreimbursed warranty costs" damages theory, Rauwendaal's underlying and supporting opinions—and Daughters' calculations based on those opinions—should be excluded.[8] Otherwise, they will taint the jury with irrelevant, false, and prejudicial impressions and turn this case into something it is not.

Dr. Rauwendaal admits that he ignores documents, data, and testimony even though, for example, he had access to the depositions in this case and was not prevented from inspecting the Gorilla Lock installed in the field at locations in Discovery Bay and South Lake Tahoe, neither place more than two hours from this courthouse. The reason for this troubling approach is evident: any objective analysis applying standard methodologies to the facts would inevitably show that there is no evidence that Gorilla Lock installed in the field is unsafe and has failed—or will fail—due to its structural integrity or mechanical strength. Dr. Rauwendaal merely endorses Leines' litigation position without an objective analysis or fair evaluation of the facts. His opinions regarding Homeland's quality control program and the status of Gorilla Lock installed in the field are wholly improper, unreliable, and should be stricken in their entirety.

Finally, in a last-ditch attempt to save Dr. Rauwendaal's testimony, Leines attempted to supplement the fatal gaps in Dr. Rauwendaal's report with improper "backdoor" evidence in the form of five self-serving declarations, all filed with Leines' initial opposition to Homeland's

---

[7] 10CD Ex. B, ¶ 66 (emphasis added).

[8] Homeland has filed a motion in limine to exclude Daughters' "unreimbursed warranty costs" opinion.

motion for summary judgment.[9]  Homeland has filed a renewed motion to strike some of the declarations because they contain readily available evidence that was not disclosed in Dr. Rauwendaal's report as a basis for his opinions.[10]  The Court should not sanction this end-run around our litigation system, federal rules, and case law—his approach is nothing short of expert testimony by ambush.  Fed. R. Civ. P. 26(a)(2), 37(c)(1); *Luke v. Family Care & Urgent Med. Clinics*, 323 F. App'x 496, 500 (9th Cir. 2009) (Rule 26 does not contain a "loophole through which a party who submits partial expert witness disclosures, or who wishes to revise her disclosures in light of her opponent's challenges to the analysis and conclusions therein, can add to them to her advantage after the court's deadline for doing so has passed"); *Encompass Ins. Co. v. Berger*, 2014 WL 12597120, at *3 (C.D. Cal. Aug. 12, 2014) (Rule 26 "prevents a party from disclosing a bare bones expert report and continuing to develop testimony beyond the deadline, effectively nullifying the other party's opportunity to depose or otherwise test the information contained in the expert report.").

## **ARGUMENT**

Rule 702 tasks the Court with acting as the gatekeeper in "ensur[ing] that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).  An expert's testimony must be both methodologically sound and logically connected to the issues before the jury.  *Id.* at 592-93; *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228 (9th Cir. 1998) (the court must assess "'whether the reasoning or methodology underlying the testimony is scientifically valid and [] whether that reasoning or methodology properly can be applied to the facts in issue.'"); *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221-22 (10th Cir. 2003) ("[T]he trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline") (*quoting Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)).  Dr.

---

[9]  Leines refers to five new declarations in support of his initial Opposition.  *See* Declarations from Leines (Dkt. 97), Rauwendaal (Dkt. 102), Todd (Dkt. 98), Gayner (Dkt. 99), and Benisek (Dkt. 96).  The Rauwendaal Opposition also repeatedly cites to paragraphs 21-33 of the Leines Declaration, but that declaration ends at paragraph 20.

[10]  Homeland's Motion in Limine #3 Re: Excluding Untimely and Undisclosed Expert Evidence and Testimony ("Objections to Evidence").

Rauwendaal's opinions are no longer relevant, lack evidentiary foundation, employ unreliable methods, exceed his expertise, and tread on the province of the finder of fact.  All his opinions should be excluded.

## I.   DR. RAUWENDAAL'S OPINIONS ARE PRECLUDED BY THE ORDER.

The Court granted Homeland's motion for summary judgment as to Leines's "unreimbursed warranty costs," holding that his "alleged warranty costs are too speculative to survive summary judgment."[11]  The Court found that "[t]here is no evidence, on this record, to support the conclusion that Leines will be or is even likely to be exposed to uncovered liabilities."[12]  Further, the Court held that

> Leines fails to present evidence of a 'reasonable approximation' of what his liability exposure might be so as to withstand summary judgment.  Instead, he points only to the expert testimony of Stephen Daughters, CPA, who opines that Leines will be exposed to 'unreimbursed warranty costs' totaling $2,823.999.  *See* Daughters Rep. ¶ 67, ECF No. 84-3.  This estimation does not delineate which warranty claims will remain uncovered by Homeland's warranty obligations.  In other words, the certainty of Leines's liability exposure is dependent on the 'whim' of Homeland's willingness and ability to cover its warranty obligations, which is insufficient at this stage.[13]

Daughter's opinion solely relied on Dr. Rauwendaal's speculative conclusion that the installed Gorilla Lock is entirely defective, structurally unsound/unsafe, and likely to fail in the field.[14]  Accordingly, Rauwendaal's underlying and supporting conclusions in Sections 1 and 7 of his report, which were solely relied upon by Daughters to calculate his "unreimbursed warranty costs" damages theory, should be excluded because the Court has held as a matter of law that Leines has no such damages.

---

[11]  (Dkt. 124-25.)

[12]  (Dkt. 124-27.)

[13]  *Id.*

[14]  10CD Ex. B, ¶¶ 66-67 (" [I]t is possible an additional 311,939 linear feet may be defective and need replacement. . . . Per Chris Rauwendaal's report, it appears likely that ***all of Gorilla Lock manufactured by HVP is defective and fails to meet basic industry standard safety testing for its advertised use.***  I have calculated the reimbursement warranty costs that would be required should all the product be considered faulty. Based on the most recent average replacement cost per linear foot of $9.05, unreimbursed warranty costs total $2,823,999) (emphasis added).

## II.   DR. RAUWENDAAL'S OVERARCHING METHODOLOGY IS UNRELIABLE, CONTRIVED, RESULTS-ORIENTED, AND INCONSISTENT WITH INDUSTRY STANDARDS AND RULE 702.

### A.   Dr. Rauwendaal's Admission That He Did Not Conduct an "Objective Analysis" is Fatal to All His Opinions.

Dr. Rauwendaal testified unequivocally that he did not conduct the objective, rigorous analysis required for a structural PVC engineering and manufacturing expert under Rule 702.  He admitted that he did nothing to validate the information that provides the foundation for his opinion.  Instead, Dr. Rauwendaal assumed, based *only* on what he was told by Mr. Leines, that 365,000 feet of product is defective due to its structural integrity or mechanical strength.[15] Rauwendaal admitted that he did not verify any data and that he conducted no independent inspection, analysis, or testing of the Gorilla Lock installed in the field.[16]  These core admissions are fatal to all of his opinions—which is why he has attempted to submit a supplemental expert report on the eve of trial more than two years after the close of fact discovery.[17]  Rule 702 requires an expert to "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of any expert in the relevant field," which Dr. Rauwendaal admittedly did not do.  *Kuhmo*, 526 U.S. at 152.

Dr. Rauwendaal also admitted he did not conduct any customer surveys or market studies directed at Leines's customers in Discovery Bay or South Lake Tahoe, or at any Gorilla Lock customers at all, to determine whether Gorilla Lock actually experienced failures in the field due to its structural integrity or mechanical strength.[18]  That Dr. Rauwendaal failed to inspect and analyze any of the Gorilla Lock installed in the field, even at easily accessible locations, and

---

[15]  Deposition of Chris Rauwendaal, 20:15-21:14; 25:1-25; 72:4-16 (attached to the 10CD as **Exhibit C**).

[16]  "Q. In that same second paragraph of your report you state that Richard Leines is exposed to approximately 365,000 feet of defective Gorilla Lock decking; correct? A. That is correct. Q. Where do you get that number from? A. From Richard Leines. Q. And what did you do to verify that number? A. It is based on my assumption that Mr. Leines is an honest person, and having worked with him no for about a year and a half, I still hold that opinion. Q. So essentially he tells you that there's 365,000 feet of defective Gorilla Lock decking out there in the field, and you just take that at face value? A. I believe that the information that I was given is correct.  And I've received no further information that would not be correct. Q. But you did no independent study or analysis of that 365,000 feet of Gorilla Lock currently installed in the field, right? A. No, I've done no independent analysis." *Id.* at 20:15-21:14.

[17]  Homeland has filed a motion to strike Rauwendaal's supplemental report in its entirety.

[18]  *Id.* at 62:12-63:12.

chose instead to solely rely on unsupported assumptions provided by Leines, shows that he performed no objective evaluation to support his purported expert analysis and opinions.  This indifference to analyzing any Gorilla Lock installed in the field is far from the "level of intellectual rigor" required for the structural engineering analyses he purports to conduct.[19]

"[W]hen an expert relies upon information given to him by a party or counsel, he must *independently verify that information* before utilizing it in his calculations."  *King-Indiana Forge, Inc. v. Millennium Forge, Inc.*, No. 1:07-cv-00341-SEB-DML, 2009 WL 3187685, at *2 (S.D. Ind. Sept. 29, 2009) (emphasis added); *see also Mooring Capital Fund LLC v. Knight*, 388 F. App'x 814, 820-21 (10th Cir. 2010) (acknowledging concern "about lack of independent investigation"); *Baker v. Firstcom Music*, No. LA16CV08931VAPJPRX, 2018 WL 2676636, at *2 (C.D. Cal. May 8, 2018) ("[E]xperts are expected to verify the reliability of the data underlying their conclusions independently instead of simply adopting the representations of an interested party.").  Dr. Rauwendaal has done the opposite, assuming as true information provided to him by Leines and then selectively relying only on that information instead of the overwhelming evidence in this action.  *See Rothbaum v. Samsung Telecomm. Am., LLC*, 52 F. Supp. 3d 185, 195-96 (D. Mass. 2014) (excluding expert report where expert selectively relied on documents and observed only a single phone in connection with plaintiff's claim that Samsung's phones were defective).

Dr. Rauwendaal's opinions are nothing more than argument couched as structural PVC engineering opinions.  Worse than the typical *ipse dixit* excluded by courts, Dr. Rauwendaal simply adopts Leines' litigation positions as his own.  *See, e.g.*, *Ask Chemicals, LP v. Computer Packages, Inc.*, 593 F. App'x 506, 510 (6th Cir. 2014) ("But [an expert's] wholesale adoption of Plaintiff's estimates, without revealing or apparently even evaluating the bases for those estimates, goes beyond relying on facts or data and instead cloaks unexamined assumptions in the authority of expert analysis. . . . Where an expert merely offers his client's opinion as his

---

[19] *Id.* at 25:17-25 ("Q. And we've already established you did not inspect any Gorilla Lock installed at homeowner properties, for example, in Discovery Bay or South Lake Tahoe?  A. That is correct.  Q. You didn't ask Mr. Leines that you wanted to go and inspect that Gorilla Lock installed in the field; right?  A. No, I did not.").

own, that opinion may be excluded."); *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1080 n.4 (10th Cir. 2006) (excluding for lack of foundation expert testimony based on the self-serving statements of an interested party and that failed to make clear that certain facts the expert described as true were *merely assumed*); *Baker*, 2018 WL 2676636, at *2 (excluding expert as unreliable who failed to independently verify "the underlying data at the core of her expert opinion" and "instead simply adopted the position of an interested party…."); *CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 677 (S.D.N.Y. 2011) ("The Court concludes that [the expert] opinion . . . is inadmissible because [the expert] 'based his opinion on the conclusory statements of [] management, and not on his independent evaluation of the facts.'"); *Craig v. Xlear, Inc.*, No. 2:16-CV-00392-DB-EJF, 2019 WL 1119429, at *21-27 (D. Utah Mar. 11, 2019) (expert's opinion may be properly excluded if expert assumes some fact based on information from a party (as to damages or otherwise) and fails to make clear that he/she is, in fact, assuming it as unreliable and potentially misleading); *Lantec, Inc. v. Novell, Inc.*, No. 2:95-CV-97-ST, 2001 U.S. Dist. LEXIS 24816, at *23 (D. Utah Feb. 13, 2001) (testimony that was "adoption (or vouching for)" plaintiff's view of the case was not based on technical expertise and was inadmissible).  Consequently, without an objective analysis of the Gorilla Lock installed in the field, all of Dr. Rauwendaal's opinions and his entire report should be excluded, including, specifically, his conclusions in Sections 2-7 of his report.

**B.   Dr. Rauwendaal Ignores Facts and Data that Contradict His Opinions and Rigs the Results of His Analysis in Leines' Favor.**

Dr. Rauwendaal admitted that he failed to consider (or even request) documents, data, and witness testimony related to the actual status of Gorilla Lock's structural integrity and mechanical strength as installed in the field from 2013 to the present.[20]  Unsurprisingly, this

---

[20]  10CD Ex. C at 13:20-14:13 ("Q. Now, in your expert report, it does not state that you reviewed many of the documents in this case; is that fair?  A. I—yeah, I saw list in the report by Dale Edwards.  Certainly he's looked at a lot more documents than I have.  Q. So is it fair to say, for example, you have not reviewed any of the parties' filings with the Court in this case?  A. I have not reviewed that, no.  Q. You have not reviewed any of the deposition testimony offered by individuals in this case?  A. No, I have not.  Q. You have not reviewed any financial documents at issue in this case.  A. I have not.  Q. You've not reviewed any of the parties' email correspondence at issue in this case?  A. No, I don't believe so.")

drives his unreliable results, including his opinion that the Gorilla Lock installed in the field "likely require[s] replacement of approximately 400,000 feet of decking material" because the Gorilla Lock boards "present a very serious safety issue" and are "more likely to fail."[21]  Fed. R. Evid. 702 (providing that, to be admissible, an expert opinion must be "based on sufficient facts or data"); *Rothbaum*, 52 F. Supp. 3d at 195-96 (excluding as unreliable an expert report that was based on "selective readings of . . . documents" and "observations of a single phone" to reach the opinion that Samsung's phones were defective).

Dr. Rauwendaal's data limitation is contrived and indefensible.  First, his opinions ignore that not a single warranty claim was submitted from 2013 to the present claiming that Gorilla Lock failed due to structural integrity or mechanical strength.[22]  Homeland has never received a single complaint or warranty claim related to a failure in the field of Gorilla Lock's structural integrity or mechanical strength, including from Leines' customers located in Discovery Bay and South Lake Tahoe.[23]  Similarly, Rauwendaal ignores that there is absolutely no evidence of personal injury caused by a failure of Gorilla Lock's structural integrity or mechanical strength.[24]

Second, he excludes all deposition testimony from his analysis regarding the actual safety and structural integrity of Gorilla Lock installed in the field, including the testimony of Leines' customers, of Leines' disclosed patent expert, and of homeowners that purchased and installed Gorilla Lock in South Lake Tahoe.  Thus, he failed to consider the actual evidence undermining his conclusory opinion that all installed Gorilla Lock is unsafe and structurally unsound.

In fact, *Leines' **own general contractor customers testified that Gorilla Lock was <u>not</u> unsafe or structurally defective***—which is why they continued to sell it to their homeowner customers for years.  For example, Doug Gayner purchased, sold, and installed Gorilla Lock in

---

[21]  10CD Ex. C at 14:1-16:25.

[22]  Ashley Johnson, Homeland's warranty clerk, testified it was "very rare to get [warranty claims] outside of mocha walnut fading."  Deposition of Ashley Johnson, 28:9-10 (attached to the 10CD as **Exhibit D**).  And the warranty claims submitted by Leines' end customers (with his assistance) confirm the same thing.  *See* Defendant's Responses to Plaintiff's Second Set of Interrogatories, 7-9 (attached to the 10CD as **Exhibit E**).

[23]  10CD Ex. E at 7-9; Declaration of Scott Smith ¶ 2 ("Smith Decl.") (filed with Defendant's Motion for Partial Summary Judgment); 10CD Ex. C at 25:13-21.

[24]  Smith Decl. ¶ 3; 10CD Ex. C at 24:12-25:12.

South Lake Tahoe for four years and for approximately 30 different homeowner projects.[25]  He

testified Gorilla Lock did not have a structural integrity problem and he would not have sold it to

his own customers if he believed it was unsafe or structurally defective.[26]  Likewise, Douglas

Todd—Leines' disclosed patent expert in this case—testified that Gorilla Lock was not unsafe or

structurally unsound and did not require replacement for those reasons.[27]  Todd also testified he

continued to purchase Gorilla Lock and was not uncomfortable selling it to his customers.[28]  In

similar fashion, the four South Lake Tahoe homeowners deposed in this case all testified that

their Gorilla Lock did not have safety problems or structural integrity/mechanical strength

problems.[29]

  Dr. Rauwendaal acknowledged he did not review or consider any of the above testimony

regarding Gorilla Lock.[30]  Consequently, his "analysis" is inconsistent with Rule 702 and

unreliable.  *Nebraska Plastics, Inc. v. Holland Colors Americas, Inc.*, 408 F.3d 410, 417 (8th Cir.

2005) ("[Expert's] calculation of future damages failed to take into account a plethora of specific

facts tending to show limits on the amount of defective fencing that would be the subject of

future warranty claims.  Therefore, we conclude that the district court did not abuse its discretion

in excluding [expert's] testimony."); *Kaseberg v. Conaco, LLC*, No. 15-CV-1637 JLS (MSB),

2019 WL 1641161, at *5 (S.D. Cal. Apr. 16, 2019) ("[T]he Ninth Circuit has precluded as

unreliable the testimony of experts whose analysis 'rests on unsupported assumptions,'

particularly those later contradicted by discovery."); *In re Nat'l Coll. Athletic Ass'n Athletic

Grant-in-Aid Antitrust Litig.*, No. 14-MD-02541 CW, 2018 WL 4241981, at *5 (N.D. Cal. Sept.

3, 2018) (excluding economist's testimony because it did "not examine any economic data at all

---

[25] Deposition of Doug Gayner, 22:6-23:5 (attached to the 10CD as **Exhibit F**).

[26] *Id.* at 21:20-22:5.

[27] Deposition of Douglas Todd, 24:6-18; 25:7-18 (attached to the 10CD as **Exhibit G**).

[28] *Id.*

[29] Deposition of Kelly Karcher, 15:15-19 (attached to the 10CD as **Exhibit H**); Deposition of Leon Malmed, 15:15-22 (attached to the 10CD as **Exhibit I**); Deposition of Kraig Riggs, 16:8-14 (attached to the 10CD as **Exhibit J**); Deposition of Kirk Wooldridge, 23:8-10; 26:20-27:1 (attached to the 10CD as **Exhibit K**).

[30] 10CD Ex. C at 14:5-7 ("Q. You have not reviewed any of the deposition testimony offered by individuals in this case?  A. No, I have not.").

to quantify, test, evaluate, or confirm any of the economic relationships upon which his [testimony] is predicated").

**C.     Dr. Rauwendaal's Opinions on Internal Wall Thickness Rest Only on One Unidentified and Uninstalled Profile Sample.**

In Sections 2 and 3 of his report, Dr. Rauwendaal used only one sample of Gorilla Lock to demonstrate that, among other things, its internal walls are too thin compared to a Gorilla Lock sample profile drawn by Homeland and provided to Leines.[31]  Despite admitting that he does not know whether the sample is representative of product installed in the field, he nevertheless leapt to two conclusions that simply parrot Leines' allegations: (a) "It is clear that virtually all dimensions measured on the extruded profile deviate significantly from the dimensions shown on the drawing;" and (b) "This would suggest either a complete absence of quality control or a highly incompetent quality control."[32]  These opinions are unreliable and should be excluded under Rule 702.

Dr. Rauwendaal examined a single 6 to 8-inch piece of Gorilla Lock he obtained from Leines to support all his opinions in Sections 2 and 3 of his Report.[33]  He does not know where the sample came from, and—*critically*—he cannot testify that the sample was representative of Gorilla Lock installed in the field.  Indeed, he did not know if the sample had been scrapped or had been purchased and installed by homeowners—and he did not even ask Leines for that foundational information.[34]

---

[31]  10CD Ex. A at 1-4.

[32]  *Id.* at 3-4.

[33]  *Id.* at 1-4; 10CD Ex. C at 32:3-6; 36:18-22 ("Q. In fact, your report in terms of measurements for the comparison between Figures 2 and 4 and Figure 1 only discusses one single sample; correct?  A. That is correct.").

[34]  "Q. And do you know where the sample came from?  A. My understanding is that it was produced at Homeland. Q. Yeah.  I understand that.  Was this sample ever actually installed in the field? A. I do not know. Q. Was it just simply sitting somewhere in Mr. Leines' inventory? A. I don't have the—the history of that sample, so where it has been, for how long, I have no information on that. Q. And you are not inclined to ask Mr. Leines where this sample came from? A. I was inclined to ask where it was made. Q. But not where it had been? A. No, I don't believe I asked that question. Q. So it's possible this sample may not, for example, be representative of a Gorilla Lock board that was actually sold to a customer and installed at their home? A. I don't know for sure one way or the other."  10CD Ex. C at 33:6-34:1.

Moreover, out of approximately 445,000 linear feet of Gorilla Lock that Leines purchased from Homeland—1,500 football fields in length—Dr. Rauwendaal elected to examine only one 6 to 8-inch piece of Gorilla Lock to conduct his measurement comparisons.[35]  Dr. Rauwendaal agreed that a single sample profile does not represent the measurements of every Gorilla Lock profile out of 455,000 linear feet that was sold by Homeland to Leines.[36]  The term "cherry-picking" does not even begin to describe what Dr. Rauwendaal did to support his unreliable conclusions in Sections 2 and 3 of his Report.  Out of 5,460,000 inches of Gorilla Lock decking board, Dr. Rauwendaal literally looked at 6 to 8 inches of a single profile to conduct his measurements, which is representative of approximately 0.000001% of Gorilla Lock decking boards Leines purchased from Homeland.  And Dr. Rauwendaal has no idea if the sample he measured was scrapped, purchased by a customer, or installed in the field.  This sort of analysis does not pass muster under Rule 702 and should never be put in front of a jury.  *See Nebraska Plastics*, 408 F.3d at 416 ("[I]f the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, it must be excluded.  An expert opinion that fails to consider the relevant facts of the case is fundamentally unsupported[.]") (citing *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000)); *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) ("Because in formulating his opinion Dr. Hynes cherry-picked the facts he considered to render an expert opinion, the district court correctly barred his testimony because such a selective use of facts fails to satisfy the scientific method and *Daubert*, and it thus fails to 'assist the trier of fact.'") (quoting Fed. R. Evid. 702)); *Rothbaum*, 52 F. Supp. 3d 185 at 195-96 (D. Mass. 2014) (excluding expert report based on "selective readings of . . . documents" and "observations of a single phone" to reach the opinion that Samsung's phones

---

[35]  *Id.* at 34:11-16 ("Q. So out of 1,500 football lengths worth of Gorilla Lock that Mr. Leines purchased, you simply chose one single small piece of a profile to make your measurement comparisons in sections 2 and 3 of your report; correct?  A. That is correct.").

[36]  *Id.* at 35:5-24 ("Q. You would agree with me that a single sample profile does not necessarily represent every profile of Gorilla Lock out of 455,000 linear feet that was sold by Homeland to Mr. Leines?  A. I would agree with you on that . . .  Q. You would agree with me that if you had used other profiles from over 1,500 football lengths worth of products, that the measurements that you draw in Figures 2 and 4 might be different?  A. Oh, I would—I would—I would agree with that because there is always—when you make a product there's always variability—from foot to foot and from yard to yard.").

were defective); *Arjangrad v. JPMorgan Chase Bank, N.A.*, No. 3:10-CV-01157-PK, 2012 WL 1890372, at *6 (D. Or. May 23, 2012) ("Reliance on incomplete facts and data may make an expert opinion unreliable because an expert must 'know[] of facts which enable him to express a reasonably accurate conclusion.'") (quoting *Smith v. Pac. Bell Tel. Co.*, 649 F.Supp.2d 1073, 1096–97 (E.D.Cal. 2009)); *Smith*, 649 F.Supp.2d at 1096–97 (excluding expert testimony in part because expert's report was "based on incomplete facts and selective documents").

Third, in offering his opinion that Gorilla Lock's walls are too thin, Dr. Rauwendaal attempted to suggest that Homeland's manufacturing process "is not capable of producing products that meet the dimensions shown" on a Gorilla Lock drawing.[37]  In his deposition, Dr. Rauwendaal was forced to acknowledge that the Homeland profile drawing he used in Figure 1 of his Report does not include the tolerance measurement ranges described and recommended in Homeland's Quality Control manual.[38]  Indeed, in making his opinions Dr. Rauwendaal never even referred to Homeland's Quality Control manual, which establishes a tolerance range for Gorilla Lock and Gorilla Deck decking boards as plus or minus 0.020 inches from the working manufacturing specification.[39]  Though readily available to him, he did not review Homeland's Quality Control manual for purposes of preparing his report or conducting his measurements.[40]

When he opined about the purported measurement discrepancies between the single unsubstantiated sample of Gorilla Lock he used (Figures 2 and 4) and the Homeland drawing (Figure 1), he failed to consider that Homeland's Quality Control manual provided an acceptable tolerance range of 0.020 inches for such measurements.[41]  Dr. Rauwendaal admitted that he knows tolerance ranges for measurements of PVC profile specifications are an industry standard

---

[37]  10CD Ex. A at 15.

[38]  10CD Ex. C at 38:3-39:19; 40:20-41:2.

[39]  Investigative Report of Dale B. Edwards at 5, 11 (attached to the 10CD as **Exhibit L**).  Put another way, Homeland's Quality Control manual acknowledges that an extruded product does not have to match precisely a given measurement—tolerances are allowed.

[40]  10CD Ex. C at 38:3-10.

[41]  *Id.* at 39:7-19 ("Q. Listen carefully to my question.  You were not aware of the tolerance specifications described in Homeland's quality control manual when you prepared your expert report, were you?  A. You need to carefully listen to my answer. Right?  Q. And your answer to my question is what.  Yes or no?  A. My answer is—when I prepared my report I had not seen the quality control manual.  It's simple.").

practice in manufacturing.[42]  When Homeland's tolerance ranges are used, even the single

unsubstantiated piece of Gorilla Lock Dr. Rauwendaal and Leines cherry-picked has dimensions

within acceptable ranges.[43]  Having failed to consider and acknowledge such a core piece of

evidence, Dr. Rauwendaal's opinions on these matters in Sections 2 and 3 and his ultimate

conclusions in Section 7 lack foundation and must be excluded.[44]

Fourth, Dr. Rauwendaal recklessly concludes that there is a "high level of incompetence

at the Homeland manufacturing operation and a near absence of quality control."[45]  Dr.

Rauwendaal, however, failed to analyze or discuss Homeland's quality control processes at all;

indeed, he admitted he did not review any documents, data, or testimony related to Homeland's

long-running quality control program regarding the manufacturing of Gorilla Lock.  Though the

information was available to him, and he had an opportunity to conduct an evaluation of

Homeland's quality control documents and processes, Dr. Rauwendaal never did.  He was

repeatedly forced to acknowledge in his deposition that he failed to attempt even the most

meager effort to weigh and consider the voluminous facts that contradict Leines' predetermined

narrative that there was a complete absence of Gorilla Lock quality control.[46]  Under these

---

[42]  *Id.* at 42:21-25 ("Q. Mr. Rauwendaal, you would agree with me that most PVC profile specifications have allowable plus or minus tolerances for manufacturing purposes; correct?  A. That's correct.").

[43]  *Id.* at 37:25-38:10 ("Q. You did not review Homeland's quality control manual regarding its products, did you?  A. Not at that time.  I have since then.  Q. And you would agree with me that you did not then review, for purposes of your expert report, Homeland's quality control manual regarding the allowable measurement tolerances of its decking products; correct?  A. When I wrote this report I had—I had not seen the Homeland quality control manual, that's correct."); 10CD Ex. L at 21 ("[T]he dimensions all conform to the dimensions of the drawing within the tolerances[.]").

[44]  If an expert concludes a "complete absence" of quality control in manufacturing, he should at least read and review Homeland's manual on the subject.

[45]  10CD Ex. A at 15.

[46]  Over a lengthy series of questions, Dr. Rauwendaal admitted that in preparing his report he (a) did not inspect Homeland's manufacturing plant where Gorilla Lock was produced; (b) did not review Homeland's quality control program related to its manufacturing processes, including its quality control laboratory; (c) did not review any documents related to Homeland's quality control program, including real-time quality control logs that were filled out during each manufacturing shift of Gorilla Lock; (d) did not know that Homeland's quality control manual and procedures were routinely audited by third-party listing agencies; (e) did not review Homeland's actual inspections, measurements, and laboratory testing of Gorilla Lock, including but not limited to real-time dimensional measurements, visual inspections, cap stock thickness measurements, drop-weight impact tests, color and gloss measurements, and weight

circumstances, it would be wholly inappropriate to permit Dr. Rauwendaal to render any opinions regarding Homeland's manufacturing processes or quality control system.

### D. Dr. Rauwendaal's Analysis of Alleged Dimensional Discrepancies in 25 Pieces of Gorilla Lock Lacks Foundation and is Contrived and Unreliable.

In Section 4, Dr. Rauwendaal discusses "wall thickness measurements" that "were made on 25 samples of Gorilla Lock product," but to be clear, Dr. Rauwendaal did not make these measurements and does not know who did![47]  Based on these measurements conducted by unknown persons, he concludes that the 25 samples do not meet the specifications in the Homeland drawing of the Gorilla Lock profile (Figure 1) and therefore "suggest a high level of incompetence at the Homeland manufacturing operation and a near total absence of quality control."[48]  He also opines that "any company that takes product quality seriously would not ship this product.  This product should have been scrapped."[49]  To arrive at these opinions, Dr. Rauwendaal takes wild shortcuts that Rule 702 is designed to stop.

First, Dr. Rauwendaal admitted that the 25 Gorilla Lock samples were not purchased or installed by customers.[50]  Though he was not entirely certain about where the samples came from, he testified be believes the samples were used by Leines for marketing purposes.[51]  Similar to Sections 2 and 3 of his report, Dr. Rauwendaal again relies on measurements from unverified samples that are not representative of the installed Gorilla Lock in the field.[52]

---

measurements; and (f) did not know any information about the scrap rate for defective Gorilla Lock coming off the production line.  10CD Ex. C at 44:24-53:2.

[47] *Id.* at 56:22-57:3; 57:10-17 ("Q: Okay. And so who actually measured those samples?  A: I don't know for sure.").

[48] 10CD Ex. A at 7.  He arrives at this conclusion with no reference to the acceptable tolerance ranges in Homeland's Quality Control manual.

[49] *Id.* at 8.

[50] 10CD Ex. C at 58:3-6 ("Q. What I want to know is where they came from.  Were they installed in the field?  A. I don't believe so.").

[51] *Id.* at 58:7-13 ("Q. So they were simply just sitting in Mr. Leines' inventory; is that fair?  A. I don't believe so.  I believe that the samples were made to be used as show-and-tell samples for— for potential customers to show off this is what we can make and this is what we can provide.")

[52] Dr. Rauwendaal argued during his deposition "it's fair to assume" that Gorilla Lock samples used in Leines' marketing "were probably as good as or better than what Homeland would normally produce in their large-scale production."  *Id.* at 58:17-25.  This opinion, found nowhere in his report, is nonsensical and goes well beyond his expertise.  In Homeland's experience, it is just the opposite.  The products installed in the field represent the best of available Gorilla Lock bundles, and samples used in marketing demonstrations are often beat up over time.  Regardless,

1
2
3
4
5
6
7
8
9
10
11

    Second, Dr. Rauwendaal did not measure the 25 Gorilla Lock samples—and he has no idea who measured them.[53]  To explain away the staggering unreliability of his methodological approach, Dr. Rauwendaal testified "any person with reasonable skill can make measurements to pretty high accuracy.  So I wasn't really very concerned about the reliability or the accuracy of the measurements."[54]  Contrary to Dr. Rauwendaal's position, the Court and Homeland should be very concerned.  In measurements where thousandths of an inch may be critical, it is utterly indefensible under Rule 702 that Dr. Rauwendaal relies on ___unverified___ measurements—by ___unknown___ persons—of ___unsubstantiated___ samples of ___uninstalled___ Gorilla Lock.  The Court should exclude all Dr. Rauwendaal's opinions in Section 4 and his related conclusions in Section 7.

### E.    Dr. Rauwendaal's Reliance on Intertek's Purported Testing of Gorilla Lock Lacks Foundation and is Wholly Improper and Unreliable.

12
13
14
15
16
17
18
19
20
21
22

    In Section 6, Dr. Rauwendaal relies on third-party tests of unidentified samples of Gorilla Lock.  A testing lab called Intertek conducted "flexure load testing" of five unknown Gorilla Lock samples across spans of 16 inches and 24 inches.[55]  Intertek's results showed that the unidentified Gorilla Lock samples did not pass "flexure load testing" to be compliant with ASTM D7032 and ICC-ES AC174 standards.[56]  Dr. Rauwendaal blindly relies on the Intertek results to conclude the following in Section 7: "Considering that the product supports people on the deck, the foregoing analysis demonstrates that the Gorilla Lock profiles manufactured and sold by Homeland, and in use today, present a very serious safety issue."[57]  This opinion—and Dr. Rauwendaal's reliance on the Intertek results described in Section 6—should be excluded. *See Beck's Office Furniture & Supplies, Inc. v. Haworth, Inc.*, 1996 WL 466673, at *7, 94 F.3d

23
24
25
26
27
28

---

Dr. Rauwendaal failed to verify, among other things, when the 25 Gorilla Lock samples were manufactured, where they were stored, and how they were used.

[53] "Q. Okay.  And so who actually measured those samples? A. I don't know for sure. Q. So you didn't—you didn't measure them? A. Not myself, no. Q. And yet you put it in your report and you don't know who actually did the measurements? A. That is correct. Q. Did Mr. Leines measure those? A. I have no information on who actually did the measurement."  10CD Ex. C at 57:10-20.

[54] *Id.* at 57:20-24.

[55] 10CD Ex. A at 14.

[56] *Id.*

[57] *Id.*

655 (10th Cir. 1996) (table) ("Experts are allowed to rely on hearsay, and even on the opinions

of others if proper foundation was laid that others in the field would likewise rely on them, but

may not merely parrot the opinions of other experts whose conclusions are not themselves in the

record."); *Nkemakolam v. St. John's Military Sch.*, No. 12-2132-JWL, 2014 WL 695740, at *3

(D. Kan. Feb. 24, 2014) ("[A]lthough an expert may rely on other experts' opinions if they

inform or contribute to his own independent opinion, he may not simply parrot or recite the

opinions and knowledge or other experts or fact witnesses.") (quoting *Ash Grove Cement Co. v.

Employers Ins. of Wausau*, 246 F.R.D. 656, 661 (D. Kan. 2007)).

   First, Dr. Rauwendaal did not attend or conduct the testing of the unknown Gorilla Lock

samples.  His report does not state what Gorilla Lock samples Intertek used, and the five pages

of Intertek correspondence he attaches are likewise silent on the issue.[58]  Accordingly, he

testified he had no clue what samples were used by Intertek—and he never asked for that

foundational information.  Thus, he does not know what year the Gorilla Lock samples were

manufactured, and he does not know whether the samples were scrapped or came from

Homeland's inventory, Leines' inventory, or actual installations from homeowners' properties.[59]

   Second, Intertek tested the unknown Gorilla Lock samples across a span of 24 inches,

which is an utterly improper use of the product.  Dr. Rauwendaal acknowledged that Gorilla

Lock was only recommended by Homeland to be spanned across a 16-inch span.[60]  He also

admitted in response to cross-examination that to span it across 24 inches would actually be

outside recommendations and something that he "certainly would not recommend."[61]  These

---

[58] *Id.* at 14, Ex. 1.

[59] "Q. And do you know what samples of Gorilla Lock they used? A. Do I know the details of when they were made.  I don't have that readily available. Q. You don't know where the samples actually came from that Intertek used for this type of testing? A. In terms of who gave them to Intertek? Q. Yeah.  I mean, for example, were these samples that had been installed in the field and replaced?  Were they samples that Mr. Leines had in his inventory?  Were they samples that Mr. Leines used for marketing purposes?  Did they just come straight from Homeland.  I mean, what are we talking about? A. I don't have the exact details. Q. Did you ever ask for that information? A. I don't recall if I specifically asked for that. Q. Did you ever see the testing being conducted on these boards? A. Was I present? Is that what you're asking? Q. Yeah, fair. A. No, I did—I did not attend the actual testing."  10CD Ex. C at 75:7-76:6.

[60] *Id.* at 76:24-77:10.

[61] *Id.*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION
IN LIMINE #1 TO EXCLUDE TESTIMONY OF DR. CHRIS RAUWENDAAL – 17

admissions are consistent with Leines' patent expert, Douglas Todd, who likewise testified that Gorilla Lock was not designed to span more than 16 inches and it would be an improper use of Gorilla Lock to span it across 24 inches.[62]  Consequently, Intertek's "flexure load testing" of Gorilla Lock across a 24-inch span—and Dr. Rauwendaal's reliance on such testing—is wholly improper and unreliable, especially when it is used to support his ultimate conclusion that all Gorilla Lock installed in the field "present[s] a very serious safety issue."

## III.   DR. RAUWENDAAL CANNOT BACKDOOR UNDISCLOSED EVIDENCE AND ANALYSIS INTO HIS REPORT THROUGH IMPROPER TESTIMONY.

In addition to the foregoing, Homeland seeks to preclude Dr. Rauwendaal from offering undisclosed opinions and evidence that he attempted to offer on re-direct testimony in his deposition.[63]  As discussed above, the opinions set forth in Dr. Rauwendaal's report are based exclusively on one single 6 to 8-inch piece of a Gorilla Lock decking board that he actually inspected and handled himself.[64]  He used this single sample to support all his opinions and conclusions in Sections 2, 3, 5, and 7 of his report.[65]  And, as explained above, although Dr. Rauwendaal has attempted to offer opinions regarding 25 unknown samples referred to in Section 4 of his report, those opinions lack foundation.  In a last-ditch attempt to remedy his complete failure to conduct an objective analysis, at his deposition during re-direct questioning by Leines' counsel, Dr. Rauwendaal tried to backdoor into evidence new additional "samples"—not disclosed anywhere in his report—that he suddenly claimed on re-direct to have vaguely "reviewed."[66]  This kind of surprise and never-disclosed expert testimony is inadmissible and circumvents the rules.  *See, e.g.*, *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008) ("Rule 26(a)(2) does not allow parties to cure deficient expert reports by supplementing them

---

[62]  10CD Ex. G at 24:21-25:2 ("Q. But you know that Gorilla Lock wasn't designed to span more than 16 inches, right?  A. Right.  Q. So that would have been an improper use of the board if you were trying to span 18 or 24, right?  A. I agree.")

[63]  Leines has also attempted to improperly and untimely supplement Rauwendaal's reports through declarations and brand-new expert reports.  Homeland has moved to exclude this evidence in its Motions in Limine #2 and #3, filed herewith.

[64]  10CD Ex. C at 82:6-24 ("A. I mentioned one sample in my report.").

[65]  *Id.* at 36:18-22 ("Q. In fact, your report in terms of measurements for the comparison between Figures 2 and 4 and Figure 1 only discusses one single sample; correct?  A. That is correct.").

[66]  *See id.* at 77:15-81:19; 81:21-83:23.

with later deposition testimony.  The purpose of Rule 26(a)(2) is to provide notice to opposing counsel—before the deposition—as to what the expert witness will testify, and this purpose would be completely undermined if parties were allowed to cure deficient reports with later deposition testimony.") (citations and internal quotation marks omitted); *David Cousyn for Cousyn Grading & Demo, Inc. v. Ford Motor Co.*, No. EDCV172051DOCKKX, 2019 WL 6434922, at *4 (C.D. Cal. July 17, 2019) (following *Ciomber* and precluding an expert from testifying at trial to additional opinions disclosed on the morning of the expert's deposition); *Hill v. Koppers Indus.*, No. CIV.A. 3:03CV60-P-D, 2009 WL 3246630, at *3 (N.D. Miss. Sept. 30, 2009) ("[I]t is not proper federal practice to assume that one can submit an incomplete expert report only to provide new opinions and/or new information during the deposition.  The deposition itself does not supplement the report.  Rather, only a timely filed supplemental report that comports with Rule 26(a)(2) can supplement an original expert report.").

Going well beyond the bounds of anything disclosed in his expert report,[67] Dr. Rauwendaal testified on re-direct that "I don't know the exact number but say I've seen 50 samples [of Gorilla Lock], and the discrepancies are all very similar and consistent."[68]  When confronted with this on re-cross, Dr. Rauwendaal was forced to admit these new "samples" were mentioned nowhere in his report:  "Q. You mentioned 50 samples that you reviewed.  You don't mention that anywhere in your report, do you?  **A. I don't mention that in my report, no**."[69] To be clear, Dr. Rauwendaal's report does not refer to, discuss, or lay any foundation for 50 additional Gorilla Lock samples that he inspected.  Nevertheless, Leines' counsel tried do an end run around the rules at the close of Dr. Rauwendaal's deposition by (i) pointing to a stack of long Gorilla Lock decking boards leaning against the wall and by (ii) placing a box of small Gorilla Lock samples in front of Dr. Rauwendaal.[70]

---

[67] *Id.* at 11:14-17 ("Q. So you understand that your opinions are limited to the matters actually raised in your report?  A. I understand that, yes.").

[68] *Id.* at 35:9-15.

[69] *Id.* at 36:11-16 (bold emphasis added); 37:2-5 ("Q. Nowhere in your report do you discuss or identify any other samples that you have reviewed, inspected or handles, do you?  A. I believe that's correct.")

[70] "Q. Mr. Rauwendaal, Counsel was just asking you about the samples sent to Intertek. A. Say that again? Q. The samples that were sent to Intertek for the testing referred to in – on page 14 –

Homeland's counsel strenuously objected to this line of questioning and improper attempt to introduce undisclosed evidence into Dr. Rauwendaal's expert report.[71]  In follow-up questions by Homeland's counsel, Dr. Rauwendaal again confirmed that the Gorilla Lock samples—sitting in the small box and leaning against the wall—were not discussed or disclosed in his expert report.  The following exchange is illustrative of Dr. Rauwendaal's lack of foundation and utter failure to conduct an objective analysis under Rule 702.[72]

Not only is Dr. Rauwendaal's methodological approach unreliable, it also renders his opinions unhelpful and irrelevant.  "The touchstone of Rule 702 is helpfulness of the expert testimony, a condition that goes primarily to relevance."  *In re Cessna 208 Series Aircraft Prods. Liab. Litig.*, No. 05-md-1721-KHV, 2009 WL 1357234, at *3 (D. Kan. May 12, 2009) (testimony of business ethicist regarding corporate culture irrelevant in products liability case); *see also Nelson v. Sandvik Mining & Const., Inc.*, No. 10-CV-5778-RBL, 2012 WL 6056547, at *3 (W.D. Wash. Dec. 6, 2012) ("The touchstone for admissibility of expert opinion evidence is whether it will be helpful to the jury.  And it is well established that expert testimony that merely tells the jury what the outcome should be is not helpful, and is not admissible.").  Dr. Rauwendaal's approach to "analyzing" Gorilla Lock, based on one single 6 to 8-inch piece of an uninstalled and unverified sample, will "not assist the trier of fact" in deciding whether Homeland's quality control processes are "complete[ly] absen[t]" or "highly incompetent" and whether installed Gorilla Lock "likely require[s] replacement of approximately 400,000 feet of

---

A. Yes. Q. –of your report.  Are those the samples?  Can you see the samples?  Are those the samples right there against the wall? A. Yes. ***** [Placing the box in front of Dr. Rauwendaal] Q. Are the samples that you mentioned right here at the—in the very first paragraph of Section 4. A. That is my understanding, yes. Q. Do you want to look at them, confirm that those are actually the samples?"  *Id.* at 77:15-25; 79:17-22.

[71]  *Id.* at 81:25-83:23.

[72]  "Q. So to answer my initial question, because I don't think you did, these samples in the box sitting right in front of you, you don't discuss or describe them in your expert report, do you? A. When I wrote the report I did not have all of those samples in a box in my possession, so clearly my report was written before that. Q. And in the samples against the wall there that Mr. Benisek showed you, you don't actually describe or discuss where those samples came from at all in your report, do you? A. I did not describe that, no. Q. And, in fact, you don't discuss that you actually reviewed or inspected them anywhere in your report, do you? A. That is correct. Q. In fact, you testified today that you don't even know who measured those boards leaning up against the wall, do you? A. That's correct."  *Id.* at 81:21-83:23.

decking material" because the Gorilla Lock boards "present a very serious safety issue" and are "more likely to fail."[73]  Further, such opinions are no longer relevant in the wake of the Court's Order dismissing Leines' "unreimbursed warranty costs" claim.  Consequently, his ultimate conclusions in Section 7 of his report should be excluded.

## CONCLUSION

Based on the foregoing, Homeland moves to exclude all of Dr. Rauwendaal's opinions, including but not limited to Sections 1-7 of his expert report.

Dated this 4th day of February, 2022.

HOLLAND & HART LLP


/s/ Darren G. Reid
Eric G. Maxfield
Darren G. Reid
Brandon T. Christensen

*Attorneys for Defendant*
*Homeland Vinyl Products, Inc*

---

[73] *Id.* at 45:4-9; 68:25-69:6.

**CERTIFICATE OF SERVICE**

I, Darren G. Reid, hereby certify that on February 4, 2022, I electronically filed the foregoing **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION IN LIMINE #1 TO EXCLUDE TESTIMONY OF DR. CHRIS RAUWENDAAL** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record registered with the CM/ECF system.

Jeffrey T. Lindgren
jlindgren@vbllaw.com

Eric W. Benisek
ebenisek@vbllaw.com

Gayle L. Gough
gayle.gough@ghcounsel.com

Laura L. Goodman
laura.goodman@ghcounsel.com

/s/ Darren G. Reid

14131919_v5